In re WATERWAYS BARGE
PARTNERSHIP, Debtor.

Bankruptcy No. 88–00560–BKC–GEL.

United States Bankruptcy Court,
N.D. Mississippi.

July 5, 1989.

E. Randolph Noble, Jr., Robertshaw, Terney, Noble and Smith, Greenville, Miss., and Simon Aron, Manatt, Phelps, Rothenberg, and Phillips, Los Angeles, Cal., for Waterways Barge Partnership.

John R. Bolton, Asst. Atty. Gen., Robert Q. Whitwell, U.S. Atty., Robert P. Crutcher, Asst. U.S. Atty., John T. Stemplewicz, Dept. of Justice, Washington, D.C., for U.S. on behalf of Maritime Admin. (MARAD) of Dept. of Transp.

## MEMORANDUM OPINION

DAVID W. HOUSTON, III,
Bankruptcy Judge.

On consideration before the Court is the plan of reorganization filed by the debtor, Waterways Barge Partnership; objection to the confirmation of said plan having been filed by United States of America Department of Transportation, Maritime Administration, hereinafter referred to as MARAD; and the Court having heard and considered same hereby finds as follows, to-wit:

### I.

The Court has jurisdiction of the subject matter of and the parties to this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (L), and (O).

## II.

### COMMENTS CONCERNING THE PROPOSED PLAN OF REORGANIZATION AS AMENDED

The plan of reorganization sets forth the following classification of claims and interests:

1. *Class I Claims:* The allowed claims of administrative creditors and creditors entitled to priority under § 507(a) [11 U.S.C. § 507(a)] of the Bankruptcy Code.

2. *Class II Claim:* The allowed secured claim of MARAD.

3. *Class III Claim:* The allowed unsecured claim of MARAD.

4. *Class IV Claims:* The allowed claims of unsecured creditors of the debtor not entitled to priority under § 507 of the Bankruptcy Code, and not included in any other class hereof, including, without limitation, claims which may arise out of the rejection of any executory contracts.

5. *Class I Interests:* The interest of the corporate general partner of the debtor, Waterways Management Corporation, a Mississippi corporation, as well as, the interests of the thirty-three limited partners of the debtor whose names and addresses were set forth on an exhibit appended to the debtor's disclosure statement.

The plan of reorganization has proposed the following treatment for the aforementioned classes of claims and interests:

1. *Class I Claims:* The debtor asserts that the creditors within this class will receive payment in cash in full on the effective date of the plan and, as such, their claims are unimpaired by the plan. It would appear that the creditors within this class are primarily the attorneys and accountants who are providing post-petition services to the debtor.

2. *Class II Claim:* To satisfy the allowed secured claim of MARAD, the debtor proposes to pay to MARAD on the effective date of the plan in cash the full value of the collateral, i.e., forty-nine grain hopper barges, currently securing the indebtedness owed to MARAD. In order to raise the funds necessary to "cash out" MARAD's allowed secured claim, the debtor proposes to sell the barges free and clear of liens to KRS Corporation, a Mississippi corporation, hereinafter referred to as KRS, at a price per barge to be set by the Court. Although the value of these barges is a disputed issue, the debtor has indicated in its plan that the value ranges from $160,000.00 per barge (total value $7,840,000.00) to $165,000.00 per barge (total value $8,085,000.00).

The aforementioned proposal presumes that MARAD would not elect to have its claim treated as fully secured pursuant to 11 U.S.C. § 1111(b)(2). Although this Court is of the opinion that MARAD could well have availed itself of this election, it did not do so; therefore, the aforesaid proposal has become material insofar as the confirmation of the debtor's plan is concerned.

According to the debtor's disclosure statement, the debt owed to MARAD is designated as follows:

| OBLIGATIONS | OUTSTANDING AMOUNT AS OF 3/18/88 |
|---|---|
| Title XI payoff (secured by ship mortgage on 49 barges) | $11,320,459.25 |
| MARAD advance of $1,000,000.00 on 4/14/82, plus accrued interest | 1,980,075.60 |
| Guarantee fee | 103,683.09 |
| **TOTAL DUE MARAD** | $13,404,217.94 |

The aforementioned amount is disputed by MARAD which claims that it is owed the total sum of $14,030,000.00.

3. *Class III Claim:* This class contains the unsecured claim of MARAD, i.e., the deficiency claim exceeding the amount of the allowed secured claim specified in Class II hereinabove. The debtor proposes to pay this claim as follows:

(a) A payment of $245,000.00 on the effective date of the plan which represents additional proceeds received from the sale of the barges to KRS.

(b) A payment of approximately $245,000.00 within sixty days after the effective date of the plan which is to be received from the proceeds of the sale of the barges to KRS or from a combination of the proceeds of said sale plus revenues generated by the barges during the pendency of the bankruptcy case. Although the Class I administrative expense claims are to be paid additionally from this fund, as well as, those Class IV creditors who elect to receive fifty percent of their allowed unsecured claims, the debtor indicates that KRS will cover any "short fall" so that MARAD will be insured of receiving this second $245,000.00 payment.

(c) A payment to be made directly from Robert B. Miller and Associates, Inc., hereinafter referred to as Miller and Associates, in the amount of approximately $629,627.83, which represents that portion of the post-petition earnings generated by the barges and payable to MARAD pursuant to the previous orders of this Court.

(d) The balance of payments to MARAD is to be made from revenues generated by the barges over a seventeen year period, less the repayment of the KRS investment plus a ten percent return on the investment. It appears that the repayment of the principal investment of KRS is to occur over the first twelve years of the plan. However, the language set forth in the plan is unclear as to the mechanics of this repayment.

Robert B. Miller of Miller and Associates estimated that the charter rate for the barges would amount to $85.00 to $90.00 per day per barge. The debtor estimated that the revenues needed to repay the KRS investment plus the ten percent interest charge would be in the range of $72.00 to $85.00 per day per barge. (See page 5, debtor's ex-parte application to make non-material modification to plan of reorganization, etc.) At the confirmation hearing, Allen Mott, the president of the debtor's corporate general partner, revised the KRS repayment figure to the sum of $82.00 to $83.00 per day per barge. The difference in the charter rate and the investment repayment rate would be paid over to MARAD by the debtor's corporate general partner which is to serve as the disbursing agent for purposes of consummating the plan. During the last five years of the seventeen year proposal, presumably following the repayment of the initial KRS investment, KRS is to deliver all excess revenues above its ten percent return on investment to the disbursing agent for payment to MARAD. The debtor estimates that the payments to KRS during this last five year period will be in the range of $45.00 to $50.00 per day per barge. (See page 5, debtor's ex-parte application to make non-material modification to plan of reorganization, etc.) As mentioned earlier, this part of the debtor's proposal is confusing, particularly if KRS is to be *fully* repaid with ten percent interest during the first twelve years after confirmation.

Although the amount is vigorously disputed by MARAD, Exhibit B to the debtor's post-confirmation trial brief reflects the amortization of the balance of MARAD's unsecured claim in the sum of $4,929,968.99. The amortization indicates a payment to MARAD at the rate of $13.00 per day per barge for the first twelve years after confirmation and at the rate of $35.00 per day per barge for the remaining five years. This is a straight amortization of the unsecured deficiency with no interest being added as compensation for the payments being made in deferred installments. The likelihood of these payments being actually made in the amounts projected seems extremely doubtful to the Court.

(Parenthetically, the Court would observe that the debtor's proposed treatment of MARAD's secured and unsecured claims

is somewhat ambiguous, perhaps because the precise amount of MARAD's allowed secured claim is dependent on the valuation of the collateral by the Court. As such, the Court is left to speculate as to whether the two $245,000.00 payments would be made if the Court's valuation were higher than that anticipated by the debtor.)

4. *Class IV Claims:* According to the debtor's disclosure statement, this class contains the claims of three unsecured prepetition creditors, to-wit:

| | |
|---|---|
| Claim of Robertshaw, Terney, Noble and Smith for pre-petition legal services (This law firm continues to represent the debtor post-petition.) | $10,000.00 |
| Claim of Chapman, Emerson and Company for pre-petition accounting services | 3,000.00 |
| Claim of Continental Illinois National Bank and Trust Company of Chicago, Corporate Trust Department, for pre-petition professional trust administration services | 2,241.69 |
| Total | $15,241.69 |

In satisfaction of the aforementioned three claims, the debtor proposes to pay either fifty percent of the allowed amount of each claim in cash on the effective date of the plan, or at the option of the holder, to pay deferred payments equal to one hundred percent of the allowed amount of each claim after the MARAD claims in Class II and Class III have been paid in full. The Court seriously doubts that any of these creditors would elect treatment under the one hundred percent option since the deferred payments would not even begin to commence until after seventeen years from the effective date of the plan.

5. *Class I Interests:* In an effort to avoid the impact of the absolute priority rule, which will be addressed hereinbelow, the debtor has proposed to provide no distribution to this class which is comprised of the interests of the debtor's corporate general partner and its thirty-three limited partners. The Court notes, however, that the debtor proposes to continue its existence as a limited partnership until the plan

of reorganization has been fully consummated. In effect, this will permit the limited partners to avoid the recapture of certain tax benefits previously taken. In addition, this proposal preserves the structure of a viable legal entity which has indicated an intention of filing litigation against MARAD for violations of the Tucker Act, the Federal Tort Claims Act, and/or the Administrative Procedure Act. This proposal, as well as, the following proposal are troubling to the Court for reasons which will be discussed hereinbelow.

Although not related to the manner of classification or the treatment of claims, the plan also provides that confirmation shall constitute a release of any and all claims or causes of action which holders of claims against the debtor may have or assert against the corporate general partner, as well as, its officers, directors and shareholders, other than as to claims which might arise post-confirmation regarding the implementation of the plan.

### III.

### OBJECTION BY MARAD TO THE SALE OF ITS COLLATERAL TO KRS CORPORATION

The discussion of MARAD's objection to the sale of the forty-nine grain hopper barges to KRS Corporation through the debtor's proposed plan of reorganization focuses on the interplay between 11 U.S.C. § 363(k) and 11 U.S.C. § 1111(b). Each of these sections is set forth fully hereinbelow:

11 U.S.C. § 363(k)

(k) At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 1111(b)

(b)(1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title

[11 USCS § 502] the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless

(i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or

(ii) such holder does not have such recourse and such property is sold under section 363 of this title [11 USCS § 363] or is to be sold under the plan.

(B) A class of claims may not elect application of paragraph (2) of this subsection if—

(i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or

(ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title [11 USCS § 363] or is to be sold under the plan.

(2) If such an election is made, then notwithstanding section 506(a) of this title [11 USCS § 506(a)], such claim is a secured claim to the extent that such claim is allowed.

(Hereinafter, all Code sections will be considered as Title 11, United States Code, unless specifically noted otherwise.)

In this case, there are at least two factors that are not in dispute between the debtor and MARAD, to-wit: (1) MARAD is an undersecured creditor having recourse against the debtor for any unsecured deficiency; and (2) the debtor's proposed plan of reorganization does not afford MARAD the opportunity to "credit bid" its allowed claims. The net effect of MARAD's objection is that since it is unable to bid for the purchase of its collateral that the debtor's plan is not fair and equitable.

In support of its position, MARAD relies on *In re California Hancock, Inc.*, 88 B.R. 226 (9th Cir. BAP 1988), a case which, in the opinion of this Court, was correctly decided, but which is not exactly applicable to the legal proposition now being considered. *California Hancock* thoroughly discussed the interplay between § 363(k) and § 1111(b), but in the context of a creditor who held a pre-petition nonrecourse claim. The debtor proposed to sell the collateral securing the creditor's claim under the plan of reorganization, without affording the creditor the opportunity to "credit bid" pursuant to § 363(k), all with the intended purpose of vitiating the recourse status granted to the creditor pursuant to § 1111(b)(1)(A). As noted in the text of the statute quoted hereinabove, a pre-petition nonrecourse creditor is accorded full recourse status as to the claim unless the class within which such claim is scheduled elects to be treated pursuant to § 1111(b)(2), or unless the property securing the claim is to be sold pursuant to § 363 or under the plan of reorganization. The Ninth Circuit Bankruptcy Appellate Panel looked beyond the literal language of the statute to the legislative history and held that the exception to recourse status for the pre-petition nonrecourse creditor should not be applied unless that creditor was given the opportunity to "credit bid" its claim.

This comports with 15 *Collier on Bankruptcy* ¶ 1111.02 (15th ed. 1985) which provides the following:

It is important to note that section 363(k) does not specifically say that the secured creditor has the right to bid at a sale pursuant to section 363(b). Theoretically, if the secured creditor's collateral was sold pursuant to a private sale and the secured creditor did not have an opportunity to bid, the right of offset contained in section 363(k) would not apply and the secured creditor would lose its right to a deficiency claim by virtue of section 1111(b)(1)(A)(ii). It is, however, the clear intent of the draftsman of the Code to protect the nonrecourse secured creditor by permitting such creditor to have recourse against the debtor, if the creditor is not permitted to bid in the amount of such creditor's debt in connection with a sale of the creditor's collat-

eral. For this reason, property encumbered by a lien in favor of a nonrecourse secured creditor should not be sold at private sale or, if the property is not sold at auction, the secured creditor should be allowed to match any offer made by a prospective purchaser at private sale.

*Id., see also, In re Woodridge North Apts., Ltd.*, 71 B.R. 189 (Bankr.N.D.Cal.1987) and *In re Realty Investments, Ltd. V*, 72 B.R. 143 (Bankr.C.D.Cal.1987).

Although *California Hancock*, and the other two cases cited hereinabove, dealt with the claims of nonrecourse creditors, the analysis in each of the opinions is significant insofar as resolving the dispute in the proceeding before this Court. MARAD, obviously a recourse undersecured creditor, has taken the position that it is unable to make the election as contemplated by § 1111(b)(2), because of the language set forth in § 1111(b)(1)(B)(ii), which indicates that the election is not available if the creditor is a recourse creditor and the property securing the indebtedness is to be sold under § 363 or is to be sold under the plan of reorganization. The identical reasoning, applicable to the nonrecourse creditor who has ostensibly lost its recourse status afforded pursuant to § 1111(b)(1)(A) because of a proposed sale of the secured property under the plan, can be applied to the recourse creditor who has ostensibly lost the right to make an § 1111(b)(2) election because of a proposed sale of the secured property under the plan. A literal reading of the statute, without reviewing the legislative history or carefully analyzing those decisions dealing with nonrecourse creditors, can result in a misunderstanding of the statute. Because MARAD was not afforded the opportunity to "credit bid" its claims under the debtor's plan, the provisions of § 1111(b)(1)(B), prohibiting the § 1111(b)(2) election, cannot be applied literally. MARAD had the right to make an § 1111(b)(2) election in this case, but did not do so. This analysis is substantiated by 15 *Collier on Bankruptcy* ¶ 1111.02 (15th ed. 1985), which provides the following:

Section 1111(b)(1)(B) contains an additional restriction upon the exercise of the section 1111(b)(2) election. Section 1111(b)(1)(B)(ii) states that a class may not exercise the election if:

"The holder of a claim of such class has recourse against the debtor on account of such claim and such property as sold under section 363 of this title or is to be sold under the plan."

As previously has been noted in connection with section 1111(b)(1)(A)(i), the reason for the inclusion of the exception contained in section 1111(b)(1)(B)(ii) is that a secured creditor who has the opportunity to protect his position by bidding in debt at the sale of his collateral and recovering his collateral, has the benefit of his bargain and requires no special protection.

The option available to the *recourse* undersecured creditor who wishes to have his claim treated as fully secured is the § 1111(b)(2) election. Regardless of whether the secured property is proposed to be sold under the plan, if the undersecured recourse creditor is not permitted to "credit bid" its claims, it is not precluded from making the § 1111(b)(2) election, regardless of the literal prohibition set forth in § 1111(b)(1)(B)(ii). If it fails to make this election, however, it is not thereafter granted the right to "credit bid" its claims in contravention of the terms of the plan of reorganization. There is simply no Code authority authorizing the approach which has been posited by MARAD. On the other hand, had the debtor's plan provided MARAD an opportunity to "credit bid", the § 1111(b)(2) election would clearly be prohibited. MARAD's appropriate remedy, since it felt aggrieved at not being able to bid for the collateral securing its allowed secured claim, was to elect to be treated as fully secured pursuant to § 1111(b)(2). Had MARAD made this election, however, it would have lost the right to vote its unsecured deficiency claim in Class III. This right to vote, under the circumstances of this case, is much more significant than the status afforded by the § 1111(b)(2) election. This will become obvious in the subsequent discussion of classification. MARAD's objection that the plan of reorganiza-

tion is not fair and equitable because it is not afforded the opportunity to "credit bid" under the plan is not well taken and will be overruled.

## IV.

## MARAD'S OBJECTION TO CLASSIFICATION

As noted earlier, the debtor has classified MARAD's prepetition unsecured deficiency claim in the sum of approximately $4,929,-968.99 in Class III, while, at the same time, has placed three other pre-petition unsecured claims totaling $15,241.69 in Class IV. MARAD has voted to reject the debtor's plan of reorganization as the Class III creditor, but two of the three creditors classified in Class IV have voted to accept the plan, which provides the debtor with one accepting class and the potential ability to "cramdown" MARAD's claims pursuant to § 1129(b). MARAD has objected to this scheme of classification, alleging that it was done solely to create one accepting class.

■ The Court observes at this point that the class containing the claims of the corporate general partner and the limited partners has technically voted to accept the plan as a result of the affirmative votes of Waterways Management Corporation, the debtor's general partner, and two of the thirty-three limited partners. The remaining thirty-one limited partners chose not to vote one way or the other. The debtor's plan recites that the members of this class are to receive or retain nothing under the plan of reorganization. As such, pursuant to § 1126(g), this class is *conclusively* deemed not to have accepted the plan, and the class is to be treated as a dissenting class for purposes of confirmation. The legislative history pertinent to this Code section indicates that it is not even necessary to solicit votes from a class whose members are to receive or retain nothing. Since by the terms of the statute, this class is conclusively deemed to reject, the Court for purposes of this case will not consider the affirmative vote of this class to be an accepting class so that the debtor might be permitted to resort to the "cramdown" pro-

visions of § 1129(b) to obtain confirmation. The insubstantial number of creditors voting within this class, as well as, the fact that the debtor's general partner is an insider whose vote should not be counted additionally lead the Court to the inescapable conclusion that the technical acceptance by this class must be disregarded in the confirmation process. (See § 101(30)(C) and § 1129(a)(10).) A position to the contrary would torture the purpose and intent of § 1129(b)(1).

■ Therefore, the critical issue that must be resolved by the Court is whether the debtor should be permitted to resort to the provisions of § 1129(b) simply because of the acceptance of Class IV, whose acceptance was gained by the affirmative votes of only two creditors whose claims amount to the total sum of $13,000.00. It should be noted that one of these two creditors, the law firm of Robertshaw, Terney and Noble, has performed post-petition legal services for the debtor and has applied for compensation for this continued representation that greatly exceeds the amount of the pre-petition claim that was voted. The Court also has observed that one of the debtor's monthly operating reports indicates that a payment for post-petition accounting services has been made to the other accepting creditor, Chapman, Emerson and Company, in the sum of $13,746.01. This creditor's pre-petition claim, as voted, amounted to only $3,000.00. An examination of the case file reveals, however, that no order has been entered permitting the employment of this firm or any firm to perform post-petition accounting services for the debtor.

The first step in this analysis is to examine § 1122 which provides the following:

11 U.S.C. § 1122. Classification of claims or interests

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

In essence, this statute says that it is impermissible to place dissimilar claims within a class, but there is no express prohibition against placing similar claims in separate classes.

The debtor has indicated that it is not relying on § 1122(b), the ability to separately classify for administrative convenience, as authority for classifying the three small unsecured claims in Class IV rather than with the MARAD unsecured claim placed in Class III. The debtor simply takes the position that the claims are dissimilar, i.e., two of the creditors classified in Class IV are continuing to work for the debtor, while MARAD has attempted to thwart the debtor at every available opportunity. Additionally, the debtor contemplates future litigation against MARAD, but not against the Class IV creditors for obvious reasons.

If the debtor is not permitted to separately classify Classes III and IV, there is no question but that MARAD, because of the size of its unsecured claim, could effectively block confirmation by causing a combined unsecured creditor class to reject the debtor's plan. *See*, § 1126(a). As mentioned hereinabove, this Court will not permit the class of interest holders to be an accepting class for purposes of confirmation. If the debtor is unable to obtain one accepting impaired class, confirmation must be denied. § 1129(a)(10). Therefore, the debtor's ability to separately classify these two classes is critical to its reorganization efforts.

A significant case dealing with the separate classification of unsecured claims is *In re Pine Lake Village Apartment Company*, 19 B.R. 819, 6 C.B.C.2d 713, 8 B.C.D. 1402 (Bankr.S.D.N.Y.1982), where Judge Howard Schwartzberg offered the following:

In determining the designation of classes, reference must be made to 11 U.S.C. § 1123(a)(1) which requires that a plan shall designate, subject to Section 1122, classes of claims and classes of interest. This section is silent as to the manner in which the separate classes are to be designated nor does it reflect an authorization for designating several classes of unsecured claims as permitted in a Chapter 13 case pursuant to 11 U.S.C. § 1322(b)(1). The classification of claims and interests, as distinguished from the designation of classes, is covered by 11 U.S.C. § 1122(a) which permits the placing of claims or interests in a particular class only if such claim or interest 'is substantially similar to the other claims or interests of such class.' Consistent with this treatment of claims in a particular class is the provision in 11 U.S.C. § 1123(a)(4) that the plan must provide the same treatment for each claim or interest in a particular class. However, there is little guidance as to the designation of separate classes, except that 11 U.S.C. § 1122(b) does allow for administrative convenience a separate class that is less than or reduced to a dollar amount approved by the court as reasonable and necessary. This is the only exception expressed in the Code for separately designating unsecured claims. Any other designation would have to comply with 11 U.S.C. § 1129(b)(1) that prescribes as a prerequisite for confirmation that 'the plan does not discriminate unfairly.'

. . . .

The creation of separate classes of unsecured and unsubordinated claims in order to allow gamesmanship in vote getting is not condoned under the Code. Indeed, a deficiency claim arising out of a secured interest in property is expressly treated as a recourse claim in 11 U.S.C. § 1111(b), even though the claim may be nonrecourse by agreement or applicable law. the recognition of the deficiency claim as entitled to the same treatment as all other unsecured claims under a debtor's plan would be undermined if debtors were permitted to classify separately such deficiency claims. The debtor may not ignore the rejection

of its plan by the holder of a large unsecured deficiency claim simply because the debtor designated a specially preferred separate class of easily created trade creditors whose acceptances may be readily obtainable by offering them more than the disfavored deficiency claim holder. Manifestly such treatment of unsecured claims is unfairly discriminatory within the meaning of 11 U.S.C. § 1129(b)(1).

19 B.R. at 829–30, 6 C.B.C.2d at 726–28, 8 B.C.D. at 1408–10.

Judge Schwartzberg concluded that there was no justifiable basis for creating two classes of unsecured creditors.

Another opinion from the Southern District of New York which is appropriate for this discussion is *In re Mastercraft Record Plating, Inc.,* 32 B.R. 106 (Bankr.S.D.N.Y. 1983), *rev'd on other grounds,* 39 B.R. 654 (S.D.N.Y.1984), where Judge Prudence Abrams commented as follows:

Although § 1122(a) deals with the placing of dissimilar claims in the same class, it by necessary implication deals with the placing of similar claims in different classes. There is no authority for classifying similar claims differently other than § 1122(b) just discussed. General unsecured claims are all alike, whether they are disputed or not, whether over or under $20,000. Thus, unless Bekins or Keel consents to a different and/or lesser treatment than that of other general unsecured creditors they may not be separately classified. Classification cannot be used to divide like claims into multiple classes in order to create a consenting class so as to permit confirmation.

32 B.R. at 108.

The above decisions were cited with approval by Judge Richard DeGunther in *In re S & W Enterprises,* 37 B.R. 153 (Bankr. N.D.Ill.1984).

As can be expected in bankruptcy jurisprudence, there is also a line of cases which allows a more flexible approach to claims classification. Many of these cases, permitting separate classification, are cited in footnote 16 appearing in *In re A G Consultants Grain Div., Inc.,* 77 B.R. 665 (Bankr.

N.D.Ind.1987), authored by Judge Francis Conrad. Although Judge Conrad permitted the separate classification of unsecured creditor claims, he did so with caution and indicated that separate classification should not be permitted if it were not in the best interest of creditors, if it did not foster the reorganization efforts, if it violated the absolute priority rule, and if it uselessly increased the number of classes. Confirmation, however, was denied in the case because the absolute priority rule was violated by the debtor's plan.

An earlier Fifth Circuit decision which indicated that separate classification could be permitted is *Matter of LeBlanc,* 622 F.2d 872 (5th Cir.1980) *reh'g denied,* 627 F.2d 239 (5th Cir.1980). The Court, however, took a cautious approach to separate classification and stated that, as a general rule, the classification in a plan should not do substantial violence to any claimant's interest, and that the plan should not arbitrarily classify or discriminate against creditors.

In the case before this Court, it is patently obvious that the only reason that the debtor has separately classified the unsecured claims in Class III and Class IV is to create a favorable class that will vote to accept the plan to meet the test of § 1129(a)(10). Although there is no direct prohibition against this separate classification in the Bankruptcy Code, the manipulative approach in this case is unfair and inequitable. Class IV was "loaded" with two pre-petition creditors who could obviously control the class for the debtor's benefit. The fact that both of the creditors are providing post-petition professional services to the debtor is evidence of their pre-disposition in favor of the debtor.

As the debtor candidly admits, the separate classification was not undertaken for purposes of administrative convenience. The debtor's argument, however, that the claims are dissimilar is without merit. The claims are all unsecured pre-petition claims. The only difference is the size of the claims which, standing alone, does not amount to a distinguishable dissimilarity. MARAD's rejecting unsecured claim approximates

$5,000,000.00, while the claims of the two unsecured creditors who voted to accept the plan total only $13,000.00. To permit these two creditors to enjoy the same voting powers as MARAD defies the concepts of fairness and equity. This Court can find no justifiable reasons for permitting separate classification in this case; therefore, confirmation of the debtor's plan of reorganization must be denied for its failure to satisfy the test of § 1129(a)(10).

## V.

### ABSOLUTE PRIORITY RULE OBJECTION

■ MARAD contends that the debtor's plan violates the absolute priority rule. In order to discuss this objection, the Court must assume that the debtor's plan has met the requirements of § 1129(a)(10), which, of course, it has not. If, hypothetically, the debtor's proposed scheme of classification were found to be acceptable, it might obtain confirmation of its plan as to MARAD's unsecured deficiency claim by complying with the fair and equitable test for unsecured claims found in § 1129(b)(2)(B) which is set forth as follows:

> With respect to a class of unsecured claims—
> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

Although the debtor proposes to pay MARAD's unsecured deficiency claim in full over a period of seventeen years, it does not provide for the payment of the present value of this claim as of the effective date of the plan, i.e., no interest is being offered as additional compensation to MARAD because the payments are proposed to be made in deferred installments.

The debtor argues that interest is not required because no junior class, i.e., the class containing the claims of the corporate general partner and the thirty-three limited partners, will receive or retain anything under the plan, and, as such, the plan complies with § 1129(b)(2)(B)(ii). This argument is without merit because of three proposals contained in the debtor's plan which are set forth as follows:

1. The debtor proposes to continue its legal existence as a limited partnership entity so that its limited partners might avoid the recapture of certain tax benefits previously received.

2. The debtor as a continuing legal entity has indicated an intention to file litigation against MARAD for causes of action arising under the Tucker Act, the Federal Tort Claims Act, and/or the Administrative Procedure Act.

3. The debtor's plan proposes that all claims or causes of action which holders of claims against the debtor may have or assert against its corporate general partner, as well as, its officers, directors, and shareholders, shall be released, other than claims which might arise post-confirmation regarding the implementation and/or consummation of the plan.

The absolute priority rule is clear. If the dissenting unsecured creditor class is not being paid in full with interest, when the payments are to be paid over time, then a junior class may retain or receive nothing. In this case, the debtor proposes to continue the existence of the limited partnership with the limited partners retaining their certificates of ownership. Regardless of whether these certificates have no value at the present time, this constitutes a retention of property, which may, in fact, have value in the future. This proposal violates the absolute priority rule. *See, Norwest Bank of Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988); *In re Stegall*, 64 B.R. 296 (Bankr.C.D.Ill. 1986) *aff'd*, 865 F.2d 140 (7th Cir.1989).

The debtors announced intention to prosecute litigation against MARAD is interesting. If the debtor were successful in suing MARAD, while remaining in existence as a

legal entity, any recovery would enhance the value of the limited partnership interests and substantiate the argument presented by MARAD that the debtor's plan violates the absolute priority rule. Otherwise, any recovery would have to be paid over to MARAD in reduction of its unsecured claim. Under these circumstances, the only persons that would benefit, if the potential claims against MARAD have merit, are the debtor's attorneys. The debtor's position as to this issue can be likened to those scenarios confronted by Yossarian in Joseph Heller's *Catch–22.*

Without belaboring the issue, there is absolutely no reason whatsoever to release the debtor's corporate general partner, its officers, directors, and shareholders from claims which the debtor's creditors might have. This Court can conceive of only rare instances when such a release should be approved. This is not such a case. The debtor's proposal as to this issue, *particularly in the absence of any compelling reason offered by the debtor,* is not well taken.

Succinctly stated, the debtor's proposal to continue its existence as a legal entity without cancelling the certificates of limited partnership, coupled with the retention of litigation rights against MARAD, violates the absolute priority rule and further mandates a decision that the debtor's plan is not confirmable.

### VI.

### OTHER PROCEEDINGS

■ As a result of the above and foregoing conclusions, the Court will address certain other pending proceedings that have been filed in this bankruptcy case, to-wit:

A. *MARAD's motion seeking relief from the automatic stay:*

Relief from the automatic stay may be provided pursuant to § 362(d), which is set forth as follows:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay-

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property under subsection (a) of this section, if-

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

In the proceeding before the Court, there is no dispute that the debtor owns no equity in the collateral securing the MARAD indebtedness. In addition, because the Court has denied confirmation of the debtor's proposed plan of reorganization, the collateral securing the MARAD indebtedness is no longer necessary for the debtor's reorganization efforts. As such, the requirements of § 362(d)(2)(A) and (B) have been met and MARAD's motion seeking relief from the automatic stay will be sustained.

B. *MARAD's motion to reopen hearing:*

■ Since the Court has denied confirmation of the debtor's plan of reorganization, the motion seeking to reopen the confirmation hearing for purposes of presenting additional testimony regarding the valuation of the collateral securing the MARAD indebtedness is now moot. As such, MARAD's motion seeking to reopen the confirmation hearing will be overruled without prejudice.

### VII.

### CONCLUSION

For the reasons set forth in this opinion, the Court will enter a separate order directing and adjudicating the following:

1. Confirmation of the debtor's plan of reorganization will be denied because, in the opinion of this Court, the debtor has failed to properly obtain the accepting vote of an impaired class which is required by § 1129(a)(10). In addition, as to MARAD's

unsecured deficiency claim, the debtor's plan of reorganization violates the absolute priority rule as set forth in § 1129(b)(2)(B)(ii).

2. MARAD's motion seeking relief from the automatic stay as to the forty-nine grain hopper barges securing its indebtedness shall be sustained.

3. MARAD's motion seeking to reopen the confirmation hearing for the presentation of additional valuation testimony shall be overruled without prejudice.