## In re BROAD ASSOCIATES LIMITED PARTNERSHIP, Debtor.

### Bankruptcy No. 5–90–01070.

United States Bankruptcy Court, D. Connecticut.

April 9, 1991.

---

James Berman, Zeisler & Zeisler, P.C., Bridgeport, Conn., for debtor.

Grant T. Stein, Alston & Bird, Atlanta, Ga., Gregory W. Nye, Hebb & Gitlin, Hartford, Conn., for Pacific Mut. Life Ins. Co.

## MEMORANDUM AND ORDER ON CONFIRMATION OF DEBTOR'S THIRD AMENDED PLAN AS MODIFIED

ALAN H.W. SHIFF, Bankruptcy Judge.

The issue presented is whether the debtor's chapter 11 plan of reorganization may be confirmed over the objection of Pacific Mutual Life Insurance Company, an undersecured creditor.

### BACKGROUND

The debtor is a Connecticut limited partnership with two general partners, Morris J. Zakheim and 300 Broad Street Corporation, and twenty-seven limited partners. In December, 1986, the debtor purchased a nine story office building located at 300 Broad Street, Stamford, Connecticut (the "building") from HAB Stamford Associates ("HAB"), a New York general partnership, for $8,000,000.00, subject to a $5,050,000.00 promissory note to Pacific Mutual Life Insurance Company ("Pacific") dated June 14, 1985. The Pacific note is secured by a first mortgage on the building; an assignment of the leases, rents, and profits of the building; and a perfected security interest in certain personal property of the debtor. The building is also encumbered by a $1,200,000.00 wrap-around mortgage held by HAB.

In November, 1988, Pacific commenced a foreclosure action against the debtor in Connecticut Superior Court after the debtor defaulted on the Pacific note. On February 14, 1989, the state court entered a judgment of strict foreclosure and established September 6, 1989 as the debtor's law day.

On September 5, 1989, the debtor filed a petition under chapter 11 of the Bankruptcy Code. On September 21, 1989, Pacific filed a motion for relief from the automatic stay, *see* 11 U.S.C. § 362(d), which was granted on February 28, 1990. *In re Broad Associates Limited Partnership,*

110 B.R. 632 (Bkrtcy.D.Conn.1990), *aff'd,* Doc. No. 90–170 (D.Conn., Cabranes, J., 7/20/90). On April 18, 1990 and December 20, 1990, the debtor filed a Third Amended Plan of Reorganization and Modification to Third Amended Plan of Reorganization, respectively, (collectively, the "Plan") which is the subject of this decision.

It is undisputed that $6,000,000.00 [1] was due on the Pacific note as of the commencement of this case, and that Pacific's claim is undersecured. *See* 11 U.S.C. § 506(a). On September 5, 1990, Pacific filed an election under § 1111(b)(2) "to the extent that Pacific Mutual may elect treatment under Section 1111(b)(2)" (footnote omitted, *see infra* at p. 712).

### The Plan

There are five classes of claims and interests in the Plan:

Class 1 consists of "[a]ll allowed secured claims" of Pacific, in .the approximate amount of $2,700,000.00, which are to be treated as follows:

> In full, complete and final satisfaction of Class 1 creditors, the Debtor shall pay to said claimant the present value of $2,700,000.00 with interest at ten (10%) percent in equal quarterly installments over fourteen years which stream of payments shall not exceed the face amount of Pacific Mutual's Allowed Claims. The first payment shall be made ninety (90) days after the Distribution Date [2]. Coterminous with the last interest payment, Pacific Mutual shall receive a lump sum payment to satisfy the balance of its Allow [sic] Claim. Pacific Mutual shall retain its liens against the Realty until paid in full under the Plan, but the Debtor shall be permitted to use rent pro-

ceeds for operations and payments under the Plan.

Article IV, ¶ 4.01; Article VI, ¶ 6.01

Class 2 consists of HAB's unsecured claim in the approximate amount of $1,300,-000.00. HAB will receive eight percent of its allowed claim on the Distribution Date. Further, the debtor will release HAB from any and all claims. Article IV, ¶ 4.02; Article VI, ¶ 6.02

Class 3 consists of the allowed claims of general unsecured creditors with recourse against the General Partners. The approximate amount of the claims is $24,000.00. The holders of Class 3 claims will be paid in full on the Distribution Date. Article IV, ¶ 4.03; Article V, ¶ 5.01

Class 4 consists of the debtor's limited partners who will receive a pro rata share of a five percent interest in Newco provided said partners pay $50,000.00 to the debtor on the Effective Date.[3] Class 4 will be extinguished if the requisite contribution is not made. Article IV, ¶ 4.04; Article VI, ¶ 6.03

Class 5 consists of the debtor's general partners who will receive a pro rata share of a five percent interest in Newco provided said partners pay $50,000.00 to the debtor on the Effective Date. Class 5 will be extinguished if the requisite contribution is not made. Article IV, ¶ 4.05; Article VI, ¶ 6.04

The Plan provides a means for its implementation, *see* § 1123(a)(5), as follows:

> This Plan is to be implemented consistent with Code Section 1123. The initial cash distributions called for under the Plan shall be made from operations, and to the extent necessary, from the guarantee of Mr. Marx and the contributions of the equity interests. Newco, an entity

---

**1.** This is an approximate number which will be used throughout this decision except for the computation of the present value of the collateralized portion of Pacific's claim, *see* note 11, *infra* at p. 715, which is based upon the actual numbers. The actual amount of Pacific's claim, as of the commencement of this case, was $5,983,000.00.

**2.** The Distribution Date is defined in the Plan as:

the later of the Effective Date or within twenty (20) days after the order entry of a final non-appealable order providing for the allowance of claims if an objection to a claim is pending on the Effective Date.

**3.** "Effective Date" is defined in the Plan as "the date the order confirming the Plan becomes final and non-appealable."

controlled by Moses Marx shall acquire the Realty. Moses Marx shall have a ninety (90%) percent interest in Newco. If Newco contributes all or part of the $100,000.00 which Class 4 and Class 5 equity interests might otherwise contribute, Moses Marx will receive an additional .0001 equity interest in Newco for each dollar contributed.

Article VII; ¶ 7.01

A letter from Moses Marx is attached to the Modification of the Third Amended Plan as Exhibit A:

> This is to confirm that I am prepared on the effective date of your Plan of Reorganization to advance $3,000,000.00 to guarantee the payments called for thereunder, including the payments to Pacific Mutual Life Insurance Company. I understand that a modification to the Fourth Amended Plan [sic] will be filed shortly, and this modification, will call for interest only payments to Pacific Mutual Life Insurance Company for the life of the Plan at ten (10%) percent on a principal balance of $2,400,000.00. At the end of the payment schedule under the Plan approximately fifteen years, and simultaneously with the final interest payment, the principal payment of $2,400,000.00 will be made. It is contemplated that the necessary funds due Pacific Mutual Life Insurance Company will be placed in an interest bearing escrow account so that all interest installments can be timely made and that the principal balance will be available at the time of the final payment. In the event that the court finds that the property is worth up to $2,700,000.00, then $2,700,000.00 will

be set in the Pacific Mutual Life Insurance Company account and the balance will be available for other necessary purposes.

. . . .

On January 4, 1991, Pacific filed an objection to the Plan, contending that its treatment is not fair and equitable; that the debtor cannot implement that treatment even if it is; and that the Plan was not filed in good faith.

## DISCUSSION

### *fair and equitable—11 U.S.C. § 1129(b)(2)*

#### 1

#### Credit Bid

■ Section 1129(b)(1) provides that a plan may be confirmed or "crammed down" over the objection of a dissenting class, *see* 11 U.S.C. § 1129(a)(8), if the plan is fair and equitable with respect to that class. Section 1129(b)(2)(A) lists three nonexclusive, alternative methods of providing fair and equitable treatment to a class of secured claims.[4] The Plan utilizes the first, (A)(i), under which Pacific is to retain its lien and receive cash in deferred payments on account of its claim. The second method, (A)(ii), provides for the sale of property free and clear of liens and permits a secured creditor to "bid in" its claim.

Pacific argues that the Plan cannot be confirmed under (A)(i) because the debtor proposes to sell the building without giving it a right to make a credit bid, that is, a bid which is offset by its $6,000,000.00 claim. *Objection of Pacific*, January 4, 1991 at p.

---

4. 11 U.S.C. § 1129(b)(2)(A) provides that

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides:

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such liens, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

9. Pacific made a similar claim during the hearing on its motion for relief from the automatic stay. That argument was rejected.

The plain language of that provision makes it applicable only where a sale "free and clear of such liens" is contemplated. The sale under the debtor's Pending Plan and New Plan would not be free and clear of liens. Further, § 1129(b)(2)(A) includes three methods for cramming down a secured creditor which are connected by "or". Code § 102(5) provides that " 'or' is not exclusive...." The legislative history to that section provides: "[I]f a party 'may do (a) or (b)', then the party may do either or both." On its face, § 1129(b)(2)(A) is disjunctive, and Pacific has not persuaded me that I should go beyond the plain language of the statute. Thus, if the debtor could meet the requirements of § 1129(b)(2)(A)(i), its inability to meet the requirements of § 1129(b)(2)(A)(ii) would not prevent confirmation.

*In re Broad Associates Limited Partnership, supra,* 110 B.R. at 636, n. 7. The sale proposed under the Plan will be not free and clear of liens, but rather subject to Pacific's liens.

There is no express code requirement that a sale proposed by a chapter 11 plan must give secured creditors the right to make a credit bid. *In re Woodridge North*

*Apts., Ltd.,* 71 B.R. 189 at 191 (Bkrtcy.N.D. Ca.1987). *See also In re Waterways Barge Partnership,* 104 B.R. 776 at 781 (Bkrtcy.N.D.Miss.1989); *In re California Hancock, Inc.,* 88 B.R. 226 (9th Cir. BAP 1988); *In re 222 Liberty Associates,* 108 B.R. 971 at 978 (Bkrtcy.E.D.Pa.1990). All that is required is that dissenting secured creditors be treated fairly and equitably. *See* 11 U.S.C. § 1129(b)(1).

Pacific contends that even if § 1129(b)(2)(ii) does not literally support its credit bid theory, it is nonetheless "philosophically" entitled to make such a bid. Pacific cites *In the Matter of D & F Construction, Inc.,* 865 F.2d 673 (5th Cir.1989), which concluded that technical compliance with the literal requirements of § 1129(b)(2) *may not* be enough to satisfy the fair and equitable standard,[5] and argues that its treatment under (A)(i) *cannot be* fair and equitable for reasons that implicate the relationship between elections under § 1111(b)[6] and credit bids.

Section 506(a) states that an allowed claim is secured to the extent of the value of the property securing the claim and unsecured to the extent that the value of such property is less than the amount of such claim. Section 502(b)(1)[7] operates to disallow the unsecured or deficiency claim of a nonrecourse creditor. Section 1111(b) was added to the Bankruptcy Code to over-

---

5. In *D & F Construction,* the court found that the plan was not fair and equitable even if it literally complied with § 1129(b)(2) because it proposed negative amortization and the deferment of substantially all repayment of principal for fifteen years.

6. Section 1111(b) provides:
   (1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless—
   (i) the class of which such claim is a part elects ... application of paragraph (2) of this subsection; or
   (ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.
   (B) A class of claims may not elect application of paragraph (2) of this subsection if—

   ....
   (ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.
   (2) If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

7. Section 502(b) provides
   ... the court, after notice and a hearing, shall determine the amount of such claim ... and shall allow such claim in such amount except to the extent that—
   (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.

ride § 502(b)(1), so that nonrecourse secured creditors, such as Pacific,[8] would not be "cashed out" by a payment equal to the value of its collateral. Section 1111(b)(1)(A) treats a secured claim as though "the holder of such claim had recourse against the debtor on account of such claim", but that treatment does not apply if (i) *an election is made under § 1111(b)(2)* or (ii) "such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan." Section 1111(b)(1)(B) provides that an election under (b)(2) cannot be made if "(ii) the holder of a claim ... has recourse against the debtor on account of such claim *and* such property ... is to be sold under the plan." (emphasis added). Section 1111(b)(2) provides, "[I]f such election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed."

As noted, *supra* at p. 709, Pacific made a § 1111(b)(2) but stated in footnote 1:

Pacific Mutual maintains that as a matter of bankruptcy law no election under Section 1111(b)(2) is permitted because the Third Amended Plan contemplates a sale of the Property under the Plan. This election is made solely to protect Pacific Mutual's rights should the Court determine that an election for treatment under Section 1111(b)(2) is permissible.

Pacific's argument appears to assert the following syllogism. If it cannot make a § 1111(b)(2) election, it must have the right to make a credit bid. It cannot make a § 1111(b)(2) election because the building is to be sold. Therefore, it must be given the right to make a credit bid. The flaw in Pacific's logic is that since it does not have recourse against the debtor, it is not prohibited from making a § 1111(b)(2) election.

Pacific also appears to argue that even if it has the right to make an election, it may choose not to and then insist upon a right to make a credit bid. I disagree. Arguably, the Plan would not be fair and equitable if it denied Pacific the right to make a credit bid and § 1111(b) denied it the

right to make an election, *see In re 222 Liberty Associates, supra,* 108 B.R. at 978, but since that is not the case, Pacific's contention that fair and equitable treatment of its claim cannot be achieved unless it has a right to make a credit bid is untenable. I accordingly conclude that Pacific does not have a right to make a credit bid. What remains is a determination of whether Pacific's treatment under § 1129(b)(2)(A)(i) is fair and equitable.

2

### 11 U.S.C. § 1129(b)(2)(A)(i)

Pacific argues that the treatment of its claim under § 1129(b)(2)(i) is not fair and equitable because, "taken as a whole, [it] is an attempt to traffic in secured claims for the sole benefit of a real estate speculator, Moses Marx." *Objection of Pacific,* January 4, 1991 at p. 13, ¶ 38. In support of that position Pacific suggests that it should be the rightful beneficiary of any appreciation in the value of the building and that Marx, with the help of the debtor's general partners, is an interloper. Pacific's protest on that basis is not warranted.

Although Pacific claims a philosophical basis for its credit bid, the effect of that position is tantamount to the argument that fairness and equity requires the debtor to insert a self destruct clause into its Plan. Moreover, although Pacific argues that only Marx will benefit from the Plan, the fact is that the Plan provides for the full amount of its $6,000,000.00 claim, albeit over fourteen years. In addition, administrative claims are to be paid in full as will the claims of the holders of Class 3 unsecured claims, all of whom would get nothing if the Plan were defeated. Further, the holder of the Class 2 claim, which would also otherwise get nothing, will be paid 8% of its claim or $104,000.00. In sharp contrast, only Pacific stands to benefit if its challenge to the Plan were to succeed.

Section 1129(b)(2)(A)(i) requires in clause (I) that Pacific retain its liens, and the Plan satisfies that requirement. Clause (II) requires that Pacific receive deferred cash

---

**8.** Pacific admitted during closing arguments    that it is a nonrecourse creditor.

payments totalling at least the allowed amount of its claims *and* at least the present value of the collateralized portion of its claims. Pacific has made a § 1111(b)(2) election to have its entire $6,000,000.00 claim treated as fully secured. The Plan complies with that election and provides for that payment. Pacific focuses on the second part of clause (II) and argues that the Plan undervalues the building; it fails to provide an adequate interest rate; and it does not pay at least the present value of the collateralized portion of its claim. *Objection of Pacific,* January 4, 1991 at pp. 10–12, ¶¶ 26–33.

Valuation of Income Producing Property

■ The debtor contends that the present value of the building is $2,700,000.00. Pacific claims that the value is $3,900,000. Having heard the testimony of the debtor's expert, Lawrence Roberts, and Pacific's expert, Christopher Rocque; reviewed their reports, *see Debtor's Exhibits* B, C, and D and *Pacific's Exhibit* 8; and assessed their credibility, I find that Roberts' testimony is more credible and that his opinion on the present value of the building is entitled to greater weight. Those findings are buttressed by the following.

Both witnesses testified that they determined the value of the building by employing an income analysis, and both stated that their computations utilized a "yield capitalization" or "discounted value" formula. *See In re Lettick Typographic,*

*Inc.,* 103 B.R. 32, 35–37 (Bkrtcy.D.Conn. 1989).[9] Roberts' calculated cash flow for a five year holding period by deducting debt service from net operating income, *see Debtor's Exhibit* C, p. 9. Rocque's cash flow analysis projected a ten year holding period with no debt service deduction.

It was Rocque's opinion that if the building were renovated, it would be fully rented in two years and would reach its maximum value in ten years. On the basis of those assumptions, Rocque testified that a "turn-around investor" would purchase the building for $8,000,000.00 in an all-cash sale. That opinion, styled as "an educated guess", is entitled to little weight.

During cross-examination, Rocque testified that he was aware of only one all-cash purchase in the Stamford real estate market and that that sale was not to a turn-around investor but to a buyer who used a substantial portion of the building for his own purposes. Rocque also said he was aware of many all-cash sales in the negotiation stage, but he declined to identify any. It is noted that in the yield capitalization formula, the elimination of debt service from operating income or cash flow results in a higher present value.

Rocque testified that a "sensitivity analysis" performed by his office demonstrated that adding years six through ten to his holding period analysis did not add more than $100,000.00 to the value of the building, but he neither explained what a sensi-

---

9. Under that method, the present value of an income producing enterprise or future income stream is computed as follows:

(a) an appropriate discount rate ("r") is established

(i)

$$\frac{\text{OI 1st yr}}{(1+r)} + \frac{\text{OI 2d yr}}{(1+r)^2} + \frac{\text{OI 3d yr}}{(1+r)^3} + \frac{\text{OI 4th yr}}{(1+r)^4} + \frac{\text{OI 5th yr}}{(1+r)^5}$$

(ii) the residual value ("RV"), also referred to as a "terminal year", is the present value of operating income for all years following the

$$\frac{\text{OI 5th yr}}{R} = \text{OIn}$$

$$\frac{\text{OIn}}{(1+r)^5} = \text{RV}$$

(iii) The present value of the income producing enterprise (in this case the building) or future income stream is computed by adding

(b) a discount rate is then used to determine the present value of future operating income ("OI") for an appropriate period of time (in this example—5 years), referred to as the holding period, as follows:

final known year and is determined by using the final year's operating income, in this case the fifth year, as follows

(R = terminal capitalization rate)

the present value of the operating income for each year in the five year holding period to the residual value.

tivity analysis is nor produced the assumptions and computations employed in that analysis. The credibility of that observation is diminished by his own numbers. A yield capitalization analysis of years six through ten, utilizing the cash flow figures supplied in Rocque's report, *Pacific's Exhibit* 8 at p. 69, and a 14% discount rate he testified that a turn-around specialist would require, demonstrates that $982,-192.26 would be added to the value of the building from the sum of the present values of those additional five years.[10]

Rocque's opinion that the building would achieve its maximum value in ten years when it could be sold for $8,000,000.00 is similarly unpersuasive. It is noted that the building was purchased for $8,000,000.00 in 1986, *see Pacific's Exhibit* 6 at p. 5 (Third Amended Disclosure Statement). It was appraised by Rocque at $4,500,000.00 on October 27, 1989 and $3,900,000.00 on November 29, 1990, *see Debtor's Exhibit* D at p. 1 and *Pacific's Exhibit* 8 at p. 3. On February 28, 1991, Rocque testified that the building had a value of $3,500,000.00. In view of the dramatic decrease from 1986 to 1991, an opinion of what the building would be worth in the year 2001 is gross speculation not an educated guess.

Finally, Rocque's opinion that the building will be fully rented in two years if renovated by the turn-around specialist is contrary to the evidence. He conceded that there is a four to five-year supply of office space in the Stamford market and that the building's location is a detriment, *see Pacific's Exhibit* 8 at p. 35. Moreover, the building is rated B— on the scale used by real estate appraisers; it is functionally obsolescent in several areas which are incurable; and its occupancy rate has declined from 62% in December 1989 to 56% in December 1990 to 39% at the present time. It is further noted that Rocque's December 1989 appraisal report, *see Pacific's Exhibit* 8, pp. 15–18, 64, also stated that at that time, the Stamford market had

a four to five-year supply of office space and that he believed the building would be fully rented in two years from then. As noted, he makes the same claim now.

Roberts' five-year analysis is more reliable. I conclude that the building has a present value of $2,700,000.00.

Present Value Discount Rate

■ Pacific claims that its treatment under the Plan "is the equivalent of a mortgage written with a one-to-one ratio (*i.e.*, written for the full value of the [building] with no equity cushion) ...". *Objection of Pacific*, January 4, 1991 at p. 11, ¶ 31. Section 1129(b)(2)(A)(i)(II) requires that Pacific receive deferred payments of at least the present value of its collateral. The question here is whether the discount rate specified in the Plan satisfies that requirement.

The Plan provides that Pacific is to receive "the present value of $2,700,000.00 with interest at 10% in equal quarterly installments over fourteen years ..." which are to commence ninety days after the Distribution Date. Coterminous with the last interest payment, the debtor is to make a lump sum payment to satisfy the balance of Pacific's allowed claim. All the payments called for under the Plan are guaranteed by Marx, *see supra*, at p. 710. The guarantee is a key factor in setting the interest rate at 10 per cent.

Pacific challenges the guarantee on the basis that it does not expressly state that the $3,000,000.00 Marx agrees to advance would be available to Pacific. But Marx testified that he would deposit cash or its equivalent in an account that would be used if the cash flow from the building were insufficient to pay any obligation under the Plan. Marx even agreed that if Newco, an entity he would control, which is to purchase the building under the Plan, sells it before all payments are made to Pacific, the balance then owed would be due and his guarantee would cover that obligation. The only conditions Marx set

10.

$$\frac{475,051}{(1.14)^6} + \frac{735,696}{(1.14)^7} + \frac{521,251}{(1.14)^8} + \frac{427,411}{(1.14)^9} + \frac{579,381}{(1.14)^{10}} = \$982,192.26$$

were that he would not have to advance the money until an order confirming the Plan is final and that the money would be put in an interest bearing account as ordered by the court. In response, Pacific argues that the guarantee is deficient because the kind of interest bearing account is left to the court. Pacific's challenge is captious. Marx's clarification of his guarantee does not substitute the court as the author of his obligation. I find that Marx's guarantee is adequate and binding.

The debtor also produced Robert Rosenberg, an economist, who testified that an assessment of risk, taking into account the retention of Pacific's liens and the availability of a segregated account of $2,700,-000.00 to guarantee Pacific's claim, and an assessment of other investment opportunities led him to the conclusion that a 10% interest rate was appropriate in computing the debtor's obligation under § 1129(b)(2)(A)(i)(II). Rosenberg's opinion is persuasive. Accordingly, I conclude that a 10% discount rate provides a fair market rate of interest.

### Present Value of Collateralized Portion of Claim

Pacific next argues that even if the collateralized portion of its claim is $2,700,-000.00, the Plan fails to provide at least the present value of that claim. As noted, *supra* at p. 712–13, the second part of clause (II) requires that Pacific must receive under the Plan deferred cash payments of at least present value of the collateralized portion of its claim. *In re Ahlers*, 794 F.2d 388 at 400 (8th Cir.1986)

*Rev'd on other grounds*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). The collateralized portion of Pacific's claim is $2,700,000.00; the present value of that claim is therefore $2,700,000.00.

The Plan provides that the debtor will pay Pacific the present value of $2,700,-000.00 with interest at ten (10%) percent in equal quarterly payments over fourteen years which stream of payments shall not exceed the face amount of Pacific Mutual's Allowed Claims.... Coterminous with the last interest payment, Pacific Mutual shall receive a lump sum payment to satisfy the balance of its Allow (sic) Claim.

Thus, Pacific will be paid $3,780,000.00 (56 installments @ $67,500.00). plus a lump sum balance of $2,203,000.00 ($5,983,-000.00, the allowed amount of its claim, less $3,780,000.00)[11]. In order to satisfy the second part of (II), the present value of those payments must total at least $2,700,-000.00. They do not.

Utilizing the Yield Capitalization method, *supra* at p. 713, I conclude that the present value of the stream of $67,500.00 installments plus the present value of the $2,203,-000.00 lump sum payment, is $2,575,-307.60.[12] The Plan fails to satisfy the second part of clause (II) and is therefore not fair and equitable.

### CONCLUSION

The failure of the Plan to satisfy the fair and equitable test of § 1129(b)(2)(A)(i) is

---

11. See note 1, *supra* at 709.

12.

$$PV = \sum_{n=1}^{56} \frac{FV_Q}{(1+r)^n} + \frac{FV_B}{(1+r)^{56}}$$

$$= \sum_{n=1}^{56} \frac{67,500.00}{(1.025)^n} + \frac{2,203,000.00}{(1.025)^{56}}$$

$$= \$2,575,307.60$$

Note: $FV_Q$ = future value of quarterly interest payment installments; $FV_B$ = future value of final payment; $n$ = period (quarter); $r$ = interest rate per period (10 4 = .025).

fatal to its confirmation. Pacific's objection is sustained, and IT IS SO ORDERED.