## In re WESTWOOD PLAZA APARTMENTS, Debtor(s).

### Bankruptcy No. 91–41536.

United States Bankruptcy Court, E.D. Texas, Sherman Division.

Aug. 3, 1992.

Glenn D. Gillett, U.S. Dept. of Justice, Commercial Litigation Branch, Washington, D.C.

Ruth Harris Yeager, First Asst. U.S. Atty., Tyler, Tex.

Joyce W. Lindauer, Dallas, Tex.

Laurette M. Kasmiersky, Wanda Cohen, Special Assts., Houston, Tex., Walter B. Thurmond, Neena Wiora, Tax Div., Dallas, Tex., for U.S.

## MEMORANDUM OPINION ON CONFIRMATION OF DEBTOR'S PLAN AS AMENDED

C. HOUSTON ABEL, Chief Judge.

On February 18 and 19, 1992, the court held a confirmation hearing on the Debtor's plan of reorganization which was filed on September 9, 1991 and amended on February 18, 1992. After reviewing the plan of reorganization, the evidence, and the law, the court is of the opinion that the plan of reorganization should be confirmed. The plan in this case was the only contested one the court decided in the interim between the panel's decision in *Phoenix Mutual Life Ins. Co. v. Greystone III Joint Venture (In re Greystone)*, 948 F.2d 134, 139 (5th Cir.1991), and the deletion of the section addressing the demise of the new value exception. *Phoenix Mutual Life Ins. Co. v. Greystone III Joint Venture (In re Greystone)*, 1991 WL 239280, 1992 U.S.App. LEXIS 2758 (5th Cir.1992). In accordance with bankruptcy rule 7052, made applicable to contested matters through rule 9014, the court has set forth its findings of fact and conclusions of law.[1] Fed.R.Bankr.Proc. 7052; 9014. Where appropriate, findings of fact shall be deemed conclusions of law, and conclusions of law shall be deemed findings of fact.

### JURISDICTION

This case was referred to the bankruptcy court under the standing order of reference, and this court has jurisdiction. 28 U.S.C. sec. 1334; 28 U.S.C. sec. 157(a). Confirmation is a core matter. 28 U.S.C. sec. 157(b)(2)(A), (O).

### FINDINGS OF FACT

The court finds the following:

---

1. At the confirmation hearing the court requested that counsel for the Debtor provide findings of fact and conclusions of law. The court, however, has prepared its own memorandum opinion.

1. Westwood Plaza Apartments ("Debtor") filed a petition for relief under Chapter 11 of the Bankruptcy Code on September 9, 1991.

2. The general partner of the Debtor is Charles McCrory ("McCrory"), and the limited partner is Hastings Management ("Hastings"). Mary Catherine Butler, McCrory's daughter, is the sole stockholder of Hastings. At the time of the confirmation hearing, Hastings managed the complex.

3. This Debtor is a family owned enterprise. Mr. McCrory is sixty-one years old, and he and his wife purchased Westwood Plaza Apartments twelve years ago. They have been involved personally with the renovation and management of the property. They own one other apartment complex which is located in Dallas, Texas.

4. After the McCrorys had owned the property for about six years, they determined that the property needed to be renovated. At that time they obtained a loan which ultimately was acquired by HUD. They moved to San Antonio for two years to renovate the project, and they have invested much of their own time making repairs and updating the project.

5. The Department of Housing and Urban Development ("HUD") is the principal creditor of the Debtor. The Debtor reached a potential workout agreement with DRG, the initial holder of the loan, in 1987. The loan subsequently went into default in late 1987. The uncontroverted testimony shows the Debtor hired an attorney in Washington and attempted to arrange a workout with HUD on six different occasions, but HUD never responded to the proposals. The Debtor filed bankruptcy because it was necessary to restructure the debt on the property.

6. The evidence demonstrates that Holly Larisch, a HUD San Antonio representative, knew of the bankruptcy filing by September 13, 1991, and that Ms. Larisch informed the Justice Department of the bankruptcy filing.

7. This court approved an agreed cash collateral order. The Debtor has complied with the terms of its agreement.

8. The Debtor listed HUD on its schedules and filed a proof of claim for HUD in the amount of $6,100,000. The court takes judicial notice that at the disclosure statement hearing, the court cited HUD to a recent Fifth Circuit case where the Fifth Circuit held that the IRS could amend a proof of claim just before the confirmation hearing. *In re Kolstad,* 928 F.2d 171 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 419, 116 L.Ed.2d 439 (1991). HUD did not amend the claim, but took the unusual procedural step of objecting to its own claim. HUD explained it objected to the estimation of the secured portion of the claim. The court concludes that this issue is addressed in its valuation of the property.

## FINDINGS REGARDING THE DEBTOR'S GOOD FAITH AND FEASIBILITY:

9. The Debtor is a limited partnership which owns an apartment complex in San Antonio, Texas. The apartment complex is the sole asset of the Debtor.

10. HUD has a lien on the apartment complex property.

11. The apartment complex has 304 units, and it is located near the Lackland and Kelly Air Bases. The Debtor's representative testified, and the court finds, that these bases will remain open in the future.

12. At present the complex is 93% occupied, and although there is some fluctuation with military transfers, the records reflect constantly high occupancy. Based on the historical occupancy and the constancy of enlisted people needing housing, the court finds that the Debtor's projections of occupancy are realistic. The rental increases that are contemplated are consistent with what the evidence shows the market will support.

13. The residents' rent provides cash flow to the Debtor, and the Debtor will receive a cash infusion from Ms. Butler. The Debtor, therefore, has cash flow and income that will support the plan of reorganization.

14. Mr. McCrory and Ms. Butler have been actively and intimately involved with the property. HUD's reviews of the property characterize the property as being well maintained and managed and note the active involvement of the owner.

15. Although HUD suggests the court should consider rehabilitation costs incurred, the evidence shows these costs occur sporadically. These rehabilitation costs will not have to be incurred again during the course of the plan. HUD also complains that the reserve for replacement fund is not fully funded at $49,000. If the Debtor has other unexpected expenses or needs to add funds to the reserve, the $100,000 contribution from the Debtor's partners may be used.

16. The Debtor owes approximately $230,000 in unsecured claims, excluding any HUD deficiency. There is no evidence that these unsecured claims were fabricated to legitimize the bankruptcy filing. The unsecured creditors include judgment and trade creditors. The court finds that there are significant unsecured claims in this case.

17. The Debtor was created shortly before bankruptcy. The apartment complex was formerly held by McCrory in his individual capacity. He testified that it was his understanding that he was not escaping individual liability because the HUD note was a non-recourse note.

18. HUD contended that by putting the apartment complex into this Debtor, Mr. McCrory was trying to escape an individual liability provision which is included in the regulatory agreement. The court finds credible Mr. McCrory's explanation that it was more logical to put this one asset in bankruptcy than to put Mr. McCrory and all of his assets into bankruptcy. To put all assets into bankruptcy would have caused needless expense and delay.

19. The court finds credible Mr. McCrory's testimony that it was his intent to assume all terms of the regulatory agree-ment. The plan provides for assumption of all terms of the regulatory agreement.

20. HUD also alleges that this bankruptcy case was filed in bad faith because the Debtor misappropriated funds by paying a higher management fee to the insider management company. HUD has contended that the actions of the Debtor's principals violate both civil and criminal fraud provisions.[2] The court finds credible the Debtor's explanations that the contractual four percent was raised to six percent during the time the York real estate management firm monitored the property for HUD and that six percent is consistent with the standard management fees for this type of manager.

21. HUD will be able to monitor the fee arrangements and even change the management of the Debtor because it has that right under the regulatory agreement and the regulatory agreement was expressly assumed in the plan.

22. Although recognizing that some of the *Little Creek* indicia for bad faith exist in this case, the court specifically finds that this Debtor can be reorganized and that the bankruptcy case and the plan of reorganization were filed in good faith.

## FINDINGS REGARDING THE VALUE OF THE APARTMENT COMPLEX:

23. Under the plan the value of HUD's secured claim is $3,000,000. McCrory based this value on a HUD appraisal and the 1990 tax valuation. In October of 1990, HUD obtained an appraisal of $3,055,000 on the property.

24. McCrory testified that based on his own review and discussions with a HUD appraiser who appraised the property in 1992 but did not testify, it was McCrory's understanding that the value of the property presently was about $2,750,000.

25. In September of 1991 there was a tax appraisal valuing the property at approximately four million, but McCrory says they never received part of appraisal because it went to HUD. By the time the

---

**2.** The court finds this allegation from a member of the civil division of the United States Attorney's office somewhat disconcerting in light of the ethical obligation not to threaten criminal action to gain advantage in civil litigation.

Debtor's representatives received a copy, the appeal time had lapsed. There is no evidence that there is any basis for the one million dollar increase or that the tax assessor visited the property.

26. John Ervin testified for HUD. Ervin is the president and owner of Ervin and Associates, a real estate asset management firm. Although Ervin is eminently qualified and experienced in real estate management, he is not an appraiser.

27. Ervin testified that he had been involved in bidding on a package sale of four properties in the San Antonio area. He explained that the bidding involved General Electric Credit purchases from the RTC. The complexes had different numbers of units, but the straight average price per unit was $13,667. Multiplying this number by the 304 apartments in the Westwood complex, Ervin suggested the value of Westwood Plaza Apartments should be $4,828,631; however, he has never seen the Westwood Plaza apartments.

28. There is no evidence indicating that the apartments in the average comparative are related in size, age, or location to the apartments involved in this proceeding. For example, the complexes sold in the package could be brand new complexes in prime San Antonio locations. A comparative of such apartments, even on an average basis, is not useful when considering the value of the Westwood Plaza Apartments, which are older and have a specific market in the outskirts of San Antonio.

29. Although the court has considered Ervin's testimony as indicating that the market is improving in San Antonio, Ervin's four million dollar comparative is not useful.

30. If the projections for the end of 1992 are applied with a cap rate of eight percent, then in a year the value of the property is about three million dollars or slightly less.

### FINDINGS REGARDING INTEREST RATE ON THE SECURED CLAIM:

31. The plan provides for payment over a five year period with a balloon payment at the end.

32. According to Ervin, market rate for commercial loans is between 9.75% and 10% on multi-family mortgages with thirty year amortization and a ten year balloon.

33. At the time of confirmation, the prime rate was 6.5 percent, the court added one percent to that to accommodate risks. In considering the risks, the court has noted that the property has been well managed, the value of the property appears to be gradually increasing, the term of the note is five rather than ten years, and this rate is consistent with current market trends in interest rates.

### CONCLUSIONS OF LAW

Before addressing the substantive merits of the objections to confirmation, the court has considered two procedural objections. First, the Debtor suggests HUD did not file a ballot against the plan, so it should be deemed to have accepted the plan. Second, HUD contends the court should not proceed with confirmation because the modifications to the plan were made at the last moment. These two procedural arguments did not bar consideration of the plan, so the court went forward with confirmation.

### *First procedural objection: Did HUD vote against the plan?*

1. Although HUD failed to vote on the plan, it filed an objection to the plan. · The Debtor asserts the court should deem the failure to vote an acceptance. If the vote were an acceptance, then the plan would be consensual.

2. Usually debtors include a ballot when they mail the disclosure statement and plan. HUD asserts it did not receive a ballot, so it was not required to return one. The court is not persuaded by the logic of this argument. First, other creditors in this case returned ballots on the plan, and these ballots support the Debtor's statement that ballots were included with copies of the plan. Second, the court appreciates that HUD receives multitudes of papers on

a daily basis, yet the attorneys for HUD attended hearings in this court and knew HUD intended to vote against the plan. A ballot is an official form which a creditor is required to return under bankruptcy rule 3018. Fed.R.Bankr.Proc. 3018(c). Even if HUD did not have a ballot, it could have returned one to the Debtor on the official form.

3. Ballots serve an important purpose in bankruptcy. They are sent directly to the debtor, and they allow the debtor to know what the obligations at confirmation will be. This court has never encountered a situation where a creditor objected to a plan but failed to return a ballot.

4. An objection to a plan differs from a vote against the plan. An objection to the plan is governed by section 1128(b), 11 U.S.C. sec. 1128(b), while ballots are governed by section 1126. 11 U.S.C. sec. 1126. Nevertheless, form should not govern over substance.

5. In an analogous context, when creditors fail to file proofs of claim, courts have deemed other documents informal proofs of claim when those documents furnish the same information that a formal proof of claim would provide. *In re International Horizons*, 751 F.2d 1213, 1218 (11th Cir. 1985). The court has reviewed the objection to confirmation filed by HUD and concludes it essentially complied with the provisions of bankruptcy rule 3018 and official form 14. Fed.R.Bankr.Proc. 3018. The Debtor knew the amount of HUD's claim, that HUD was the creditor voting, and that HUD was dissatisfied with the terms of the plan. The court therefore deems the objection an informal ballot against the plan.

6. Bankruptcy courts have split on the issue of whether an impaired class which fails to vote on a plan should be deemed to have voted for the plan. *Compare In re Ruti–Sweetwater, Inc*, 836 F.2d 1263, 1266 (10th Cir.1988) (Failure to vote deemed acceptance) *with In re Townco Realty*, 81 B.R. 707, 708 (Bankr.S.D.Fla.1987) (Failure to vote cannot be deemed acceptance). Based on its conclusion that an informal ballot against the plan was filed, the court finds it unnecessary to reach the legal is-sue of whether a failure to vote constitutes a vote for or against the plan.

*Second procedural objection: Was the notice of amendment sufficient?*

■ 7. The plan of reorganization was modified because of the indication in the first *Greystone* opinion that the new value exception did not survive the enactment of the Bankruptcy Code. *Greystone v. Phoenix Mutual Life Ins. Co. (In re Greystone)*, 948 F.2d 134 (5th Cir.1991). Subsequently, the portion of *Greystone* that caused the plan amendment was withdrawn. *Greystone v. Phoenix Mutual Life Ins. Co. (In re Greystone)*, 1991 WL 239280, 1992 U.S.App. LEXIS 2758 (5th Cir.1992).

8. HUD objected that it had not had sufficient time to evaluate the modification of the plan and that the plan modification adversely impacted other creditors. The Debtor responded that the modification did not adversely impact other creditors. Based on the rule 3019, Fed.R.Bankr.Proc. 3019, and the reasoning in *In re American Solar King Corp.*, 90 B.R. 808, 823–24 (Bankr.W.D.Tex.1988), the court found that notice was adequate.

■ 9. As to HUD's objection that other creditors would not consent to the modifications of the plan if they knew about them, creditors lack standing to challenge provisions of a plan that do not affect them. Fed.R.Bankr.Proc. 3020(b); *In re B. Cohen & Sons Caterers, Inc.*, 124 B.R. 642 (Bankr.E.D.Pa.1991), *appeal dismissed*, 908 F.2d 963 (3d Cir.1990).

## CONFIRMATION

■ 10. Section 1129 establishes the requirements for confirmation. This court follows the majority view that proponents of plans must prove the requirements of 1129(a) by a preponderance of the evidence. *E.g. In re MCorp Financial*, 137 B.R. 219, 225 (Bankr.S.D.Tex.1992), *appeal dismissed*, 139 B.R. 820 (S.D.Tex.1992); *Home Savings Ass'n v. Woodstock Assocs. I, Inc. (In re Woodstock Assocs. I, Inc.)*, 120 B.R. 436, 453 (Bankr.N.D.Ill.1990); *but see In re*

*Briscoe Enterprises Ltd., II*, 138 B.R. 795, 804–05 (Bankr.N.D.Tex.1992) (discussing case law and indicating that appropriate standard is clear and convincing evidence).

11. Courts have held that under section 1129(b), the cramdown provision, the burden is clear and convincing evidence. *Briscoe*, 138 B.R. at 804; *MCorp*, 137 B.R. at 225.

■ 12. The court has a mandatory, independent duty to review plans and ensure they comply with the requirements of section 1129, *Williams v. Hibernia Nat'l Bank (In re Williams)*, 850 F.2d 250, 253 (5th Cir.1988), and the court must consider the plan in light of the facts and circumstances of the case. *In re D & F Construction*, 865 F.2d 673, 675 (5th Cir.1989).

13. After considering the plan in accordance with these requirements, the court concludes the plan should be confirmed.

*Compliance With Applicable Provisions of the Code, 11 U.S.C. sec. 1129(a)(1), (2)*

14. The plan conforms to the applicable provisions of Chapter 11, and the plan proponent also has complied with the applicable provisions. 11 U.S.C. sec. 1129(a)(1), (2). Under sections 1129(a)(1) and (2), the court must review the Bankruptcy Code to ascertain if the Debtor and the proponents complied with other Bankruptcy Code provision. The provisions that generally are involved include estimation of claims under section 502, classification of claims under section 1122(a), unequal treatment of claims under section 1123(a)(1), and a showing of how the plan will be implemented under section 1123(a)(5).

15. HUD's objections in this case do not go to estimation of claims because their claim has been deemed allowed.

16. The classification of claims is proper. It is consistent with the guidelines established in *Greystone*, 948 F.2d at 139–41 (5th Cir.1991).

■ 17. If there has been any unequal treatment of claims, HUD has benefitted from that treatment and does not have standing to object. The court notes that the special treatment of trade creditors in this case complies with the *Greystone* test. *Greystone*, 948 F.2d at 141.

■ 18. The Debtor has shown that this plan will be implemented with the earnings of the Debtor and with the contributions of equity owners.

*Good Faith, 11 U.S.C. sec. 1129(a)(3)*

■ 19. The Fifth Circuit has said that good faith must be determined in light of the totality of circumstances surrounding the bankruptcy filing. *Public Finance Corp. v. Freeman*, 712 F.2d 219, 221 (5th Cir.1983). Good faith is a question of fact for the judge to determine. *Public Finance*, 712 F.2d at 221; *Little Creek v. Commonwealth Mortgage (In re Little Creek)*, 779 F.2d 1068, 1072–73 (5th Cir. 1986).

20. HUD objects that this bankruptcy case was filed in bad faith because this Debtor is a "new debtor." Mr. McCrory remains a general partner of the Debtor, and under Texas partnership law he remains liable for partnership obligations. Tex.Rev.Civ.Stat.Ann. art. 6132b, secs. 15, 36 (Vernon 1970 & Supp.1992). Without deciding the legal effect of the regulatory agreement, the court emphasizes that Mr. McCrory is not a debtor in this proceeding. To the extent that he is liable under the regulatory agreement, he remains liable. This plan was not filed with the intent to escape individual liability, and Mr. McCrory has not attempted to modify the terms of section 524(e). 11 U.S.C. sec. 524(e).

21. In *Little Creek*, the Fifth Circuit discussed the following indicia of bad faith:

a. The debtor has one asset;

b. The secured creditor or creditors has a lien on this asset;

c. There are no employees except for principals;

d. There is no cash flow or source of income to support a plan of reorganization;

e. There are few unsecured creditors;

f. The property has been posted for foreclosure or the creditor and the

debtor have reached a standstill in state court litigation. *Little Creek,* 779 F.2d at 1073.

22. The *Little Creek* court characterized the "new debtor syndrome" as being a one asset entity created on the eve of foreclosure "to isolate the insolvent property and its creditors." *Little Creek,* 779 F.2d at 1073.

23. The court has reviewed each of the *Little Creek* factors in its findings of fact. While this case demonstrates some of the bad faith factors, in light of all the facts, the court finds that the case is filed in good faith.

### *Payment of Fees Subject to Court Approval, 11 U.S.C. sec. 1129(a)(4)*

24. The plan makes payment of attorneys' fees subject to court approval.

### *Disclosure of Management's Relationship to the Debtor, 11 U.S.C. sec. 1129(a)(5)*

25. The plan discloses that Hastings Management will manage the Debtor subject to HUD's determination that new management is needed.

### *Best Interest, 11 U.S.C. sec. 1129(a)(7)*

26. Under the best interest test, the court must evaluate the plan and determine that the plan provisions are better for HUD than liquidation. *In re Elm Creek Joint Venture,* 93 B.R. 105, 109 (Bankr. W.D.Tex.1988). If the property were liquidated, the unsecured creditors under the plan would receive nothing. Under the plan, HUD receives full payment of its unsecured claim, and the other unsecured creditors receive fifty percent. The court therefore concludes that the unsecured creditors benefit from reorganization.

### *Impaired Class Voted for Plan, 11 U.S.C. sec. 1129(a)(10)*

27. At least one impaired class voted for the plan.

### *Feasibility, 11 U.S.C. sec. 1129(a)(11)*

28. To determine feasibility the court must consider factors such as the debtor's historical performance, the sufficiency of the capital structure, the earning power of the business, economic conditions, and management. *Canal Place Limited Partnership v. Aetna Life Ins. Co. (In re Canal Place Limited Partnership),* 921 F.2d 569, 579 (5th Cir.1991) (per curiam). The court's findings with regard to these factors are included in the findings of fact. This plan is feasible and not likely to be followed by liquidation or further financial reorganization.

### CRAMDOWN: Section 1129(b)

29. If an impaired class of creditors fails to accept a plan of reorganization, the plan proponent may request cramdown under section 1129(b). The court may approve a plan under this provision if "the plan does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. sec. 1129(b).

### *Valuation of the Property*

30. Under section 1129(b)(2)(A)(i), the court must determine the present value of the deferred payments under the plan. As this plan provides for payment to the secured creditor, the court must evaluate the stream of payments to the creditor, discount those payments, and determine if the final number gives present value. *In re Lakeside Global II, Ltd.,* 116 B.R. 499 (Bankr.S.D.Tex.1989).

31. As the Fifth Circuit has noted, "the valuation of the assets of a debtor in bankruptcy ... is an integral part of the confirmation process under Chapter 11." *In re Texas Extrusion Corp.,* 844 F.2d 1142, 1165, *cert. denied,* 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 330 (1988). Recognizing that valuation is necessary, the parties have both produced evidence to demonstrate the value of the apartment complex.

32. "[V]aluation is determined on a case-by-case basis, taking into account the nature of the debtor's business, market

conditions, the debtor's prospect for rehabilitation, and the type of collateral." *Sutton v. Bank One (In re Sutton)*, 904 F.2d 327, 330 (5th Cir.1990) (citations omitted).

33. As Mr. McCrory is not an accredited appraiser, the court must give his testimony regarding the present value of the property less weight than that of an expert. *In re Galvez*, 69 B.R. 248, 250 (Bankr. M.D.Fla.1986). Nevertheless, the testimony has some probative value.

34. The 1990 HUD appraisal indicates the value of the property is around three million dollars. The court has found that appraisal to be the most credible evidence of value. It is also consistent with an eight percent cap rate applied to the 1992 projections. The three million dollar valuation is consistent with the long term financial projections of value.

*Interest rate:*

35. Although Westwood suggests that the plan merely bifurcates the original contract interest rate, that bifurcation does not follow the commutative and associative rules of mathematics. This is demonstrated by an example that does not consider the impact of interest:

$$(6)(9.5) \ = \ 57$$

$$\text{BUT} \ \ (3)(6.5) + (3)(3) \ = \ 28.5$$

The court therefore has not relied upon the bifurcation argument when considering whether this plan meets the requirements of section 1129(b).

36. When determining the appropriate interest rate, courts have considered both the contract interest rate and the market interest rate. If a case involves cramdown, courts consider the market rate because they view plan repayment provisions as being analogous to a new loan. *United States v. Arnold*, 878 F.2d 925, 929–30 (6th Cir.1989).

37. Several circuits have reached different conclusions about how to compute the current market rate of interest. *See* Thomas O. Depperschmidt, *Choosing the Proper Interest Rate in Bankruptcy Proceedings: Resolution of Special Issues in the Sixth, Eighth, and Ninth Circuit*, 18 N.Ky. L.Rev. 457 (1991). Some courts apply the current market interest rate for similar loans made in the region. *See e.g. Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 431 (6th Cir.1982) (applying analogous interest provision in Chapter 13 context). Other courts use a formula which begins with a base such as the treasury bill rate or the prime rate and adds a risk factor. *See e.g. Farm Credit Bank of Spokane v. Fowler (In re Fowler)*, 903 F.2d 694, 697 (9th Cir.1990) (applying analogous interest provision in Chapter 12 context).

38. As this court can find no Fifth Circuit authority addressing the issue, this court has followed the authority from the ninth circuit that holds the prime rate may be used as a basis for determining market rate. This is because computation of the prime rate encompasses the "general level of money rates, the availability of reserves, general business conditions, size and term of loan, geographic variations, elements of profit and collection costs." *In re Welco Indus. Inc.*, 60 B.R. 880, 883 (Bankr. 9th Cir.1986).

39. With the prime rate establishing a base, the court then adds on a risk factor by considering the length of the payout period, the quality of the security, and the risk of default. *Patterson v. Federal Land Bank (In re Patterson)*, 86 B.R. 226, 228 (Bankr. 9th Cir.1988) (citations omitted). In applying these factors the court has considered that the apartments are well managed by people who care about the project, and the family is committed to making the project work. The complex is not a part of a conglomerate with people who view this investment as but one of a number of investments. Because the value of the collateral is stable and because the risk to HUD for this type of debtor is low, the court finds that the appropriate interest rate for this loan under current market conditions is prime plus one.

### THE UNSECURED PORTION OF THE HUD CLAIM:

40. The Debtor proposes to give HUD three percent interest on the unsecured portion of its claim.

41. The cramdown provisions for secured claims require "that each holder of a claim of such class receive on account of such claim deferred cash payments totalling at least the allowed amount of such claim, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." 11 U.S.C. sec. 1129(b)(2)(A)(i)(II).

42. Similarly, the cramdown provisions for unsecured claims specify "that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim." 11 U.S.C. sec. 1129(b)(2)(B)(i).

43. With regard to unsecured claims, the Congressional Record explains that the "present value of the property given to the holders of unsecured claims is equal to the allowed amount of the claims...." 124 Cong.Rec. H11303–05 (daily ed. Oct. 6, 1978) (remarks of Rep. Edwards and Sen. DeConcini), *reprinted in Norton Bankruptcy Code Pamphlet* (William L. Norton ed. 1991–92).

44. The question for the court, thus, is what interest rate applies to the unsecured claim. If one analyzed unsecured claims exactly the same way as secured claims, the applicable interest rate for unsecured claims would be higher than the rate for secured claims because risks are great when loans are made and there is no collateral. *See In re Noe,* 76 B.R. 675, 679–80 (Bankr.N.D.Iowa 1987) (discussing this argument but not squarely addressing it).

45. Giving unsecured claims a higher interest rate than secured claims is inconsistent with the basic structure of bankruptcy law. Bankruptcy rewards investors who secure loans with collateral, and the compensation they receive is for the continued use of their collateral under the plan.

46. In contrast to the secured creditor, the unsecured creditor already has made a bad investment, and there is no way to recoup the loss. The money is gone. This reality in part explains the need for the liquidation analysis. Under the facts of this case, the main asset is the apartment complex, and if it were sold, HUD, in its unsecured capacity, would receive nothing. As an unsecured claimant, HUD will only benefit by confirmation of the plan.

47. It is clear both from the statute and from the legislative history that Congress contemplated that some interest would be paid, or there would have been no mention of present value. The court concludes that the interest rate to be applied to these loans is a very conservative rate, the type of rate applied to minimal risk investments such as certificates of deposits and interest on savings accounts. The court thus concludes that three percent is a reasonable interest rate for the unsecured claim of HUD.

## CONCLUSION

48. Based on the foregoing analysis, the court concludes that the requirements of 1129 have been met, and that the Westwood Plaza plan of reorganization should be confirmed. An order reflecting the findings and conclusions of the court shall be entered concurrently with this memorandum opinion.

## ORDER ON CONFIRMATION OF DEBTOR'S PLAN AS AMENDED

For the reasons stated in the memorandum opinion issued concurrently with this order, the court ORDERS that the Debtor's plan of reorganization is APPROVED. The following oral modifications are adopted as being part of the plan:

1. HUD retains the right to approve the management company and agent for the property.

2. Payments on the HUD allowed unsecured claim are fixed annual payments. Failure to make annual payment on the HUD allowed unsecured claim as required by the plan of reorganization as modified shall constitute an event of default under the plan as modified.

3. The rate of interest shall be 7.5% on HUD's secured claim, which constitutes prime plus a one percent risk factor.

4. In the event of a HUD sale or a refinancing of the HUD allowed secured claim, any net sales proceeds or net refinancing proceeds received shall be first paid to reduce the claims of the unsecured creditors and then paid to the equity holders of the Debtor.

It is so ORDERED, ADJUDGED, AND DECREED.