In re The WAY APARTMENTS,
D.T., Debtor.

BEAL BANK, S.S.B., assignee of United States of America Department of Housing and Urban Development, Appellant,

v.

The WAY APARTMENTS,
D.T., Appellees.

Civil Action No. 4:93–CV–370–Y.
Bankruptcy No. 492–43672–11.

United States District Court,
N.D. Texas,
Fort Worth Division.

Aug. 2, 1996.

448

Charles Runyon Gibbs, Lynnette Randee Warman, Jenkins & Gilchrist, Dallas, TX, for appellant.

Joyce Williams Lindauer, Law Office of Joyce W. Lindauer, Dallas, TX, for appellees.

## MEMORANDUM OPINION AND ORDER

MEANS, District Judge.

Pending before the Court is the appeal of Beal Bank, S.S.B. ("Beal") to the confirmation by the bankruptcy court of the debtor's Chapter 11 Plan of Reorganization. Having carefully considered the briefs of the parties, the record, and the applicable law, the Court finds that the rulings of the bankruptcy court should be AFFIRMED.

## I. Jurisdiction

The Court has jurisdiction to consider the bankruptcy court's order confirming the debtor's Chapter 11 Plan of Reorganization pursuant to 28 U.S.C. § 158(a).

## II. Background Facts

The Way Apartments, D.T., ("the debtor") filed its petition in bankruptcy on August 10, 1992. The debtor's principal asset is an apartment project commonly known as The Way Apartments ("the Property"). The initial appellant, the Department of Housing and Urban Development ("HUD"), held a lien on the property in the original principal amount of $2,786,000.00.[1] On August 24, 1992, the debtor filed its Chapter Eleven Plan of Reorganization. The debtor filed the First and Second Modifications to the Plan on October 23, 1992 and March 3, 1993 respectively (as modified, "the Plan"). HUD

---

1. HUD's secured and unsecured interest in the property has been assigned to Beal Bank, S.S.B. ("Beal"), and Beal has been substituted as the appellant in this case.

filed a timely objection to the Plan on December 11, 1992.

The bankruptcy court held a confirmation hearing for the Plan on January 25; March 22, 23 and 24; and April 19, 1993. The Plan provides for nine classes of claims. The debtor proposes to pay all claims under the Plan, either in part or in full, over two time periods of seven and nine years. The classes that are the subject of this appeal are Classes 3, 6, 7, 8, and 9. The value of the property as of the petition date was less than the amount of Beal's lien. Class 3 consists of Beal's allowed secured claim which the bankruptcy court determined to be $2,150,000.00. Class 6 is comprised of unsecured trade creditors with claims of less than $1,000.00. Class 7 is comprised of the claims of unsecured creditors with claims greater than $1,000.00. Class 8 contains Beal's unsecured claim of $1,474,595.43. Class 9 consists of claims of the general and limited partners and the equity interest holders. Both Class 6 and Class 7 voted to accept the Plan. HUD objected to the Plan. However, 11 U.S.C. § 1129 provides that if one class accepts the Plan and all of the other statutory requirements are met, the Plan may be crammed down over the dissenting creditors' objections. The acceptance of the Plan by Class 6 and Class 7 allowed the Plan to be crammed down over HUD's objection.

The bankruptcy court approved the debtor's Plan and adopted the findings of fact and conclusions of law prepared by counsel for the debtor on May 3, 1993. On May 13, 1993, HUD filed its Notice of Appeal.

### III. The Bankruptcy Court's Findings of Fact and Conclusions of Law

 Beal first asserts that it was error for the bankruptcy court to adopt the Findings of Fact and Conclusions of Law prepared by the debtor's attorney. The Court finds that the bankruptcy court did not breach its duty to determine that the Plan met all the requirements of 11 U.S.C. § 1129 by adopting the Findings of Fact and Conclusions of Law prepared by the debtor's attorney. The mere fact that the bankruptcy court accepts the findings of the prevailing party does not suggest that the court has not properly considered the evidence. *See Falcon. Constr. Co. v. Economy Forms Corp.,* 805 F.2d 1229, 1232 (5th Cir.1986).

 Additionally, Beal failed to articulate which findings of fact and conclusions of law it believed to be clearly erroneous. (Appellant's Br. at 11.) In order to state a valid appeal, Beal must demonstrate that particular findings are clearly erroneous. *Falcon Constr.,* 805 F.2d at 1232. Beal may not ask the Court to review the entire record in a wholesale search for error, as Beal does in the present case. *Id.* When the Court adopts verbatim a party's proposed findings it must be assumed that "the trial judge considered the case from all angles and reached his decision independently before placing reliance on the proposed findings." *Keystone Plastics, Inc. v. C & P Plastics,* 506 F.2d 960, 962 (5th Cir.1975). "The ultimate question that the judge must face is whether to enter judgement for plaintiff or defendant, and he must decide this question on his own before deciding which proposed findings to accept." *Id.* Moreover, even though the bankruptcy court accepted the findings of the appellee's attorney without change, the appropriate standard of review remains the clearly erroneous standard for findings of fact and the de novo standard for conclusions of law. *Keystone,* 506 F.2d at 963. "The question for the appellate court under Rule 52(a) is not whether it would have made the findings of fact that the trial court did but whether 'on the entire evidence [it] is left with the definite and firm conviction that a mistake has been committed.'" *Id.* The bankruptcy court did not err per se in adopting the findings of fact and conclusions of law prepared by the prevailing party.

### IV. Rule 9011

Beal's second point of error is that the failure of the debtor's attorney to sign the first and second modifications of the Plan mandates that the Plan should be stricken. At the confirmation hearing it was brought to the judge's attention that the debtor's attorney had not signed the first and second modifications to the confirmation plan. (Transcript of Confirmation Hearing, Jan. 25, 1993 and Feb. 22 and 24, 1993 at 125 [herein-

after Tr. I].) The bankruptcy court found it unnecessary for the debtor's attorney to sign the modifications to the Plan and that it was customary for only the debtor to sign those documents. (Tr. I at 126.)

 Federal Rule of Bankruptcy Procedure 9011 mandates that if a party has an attorney, the attorney must sign "[e]very petition, pleading, motion and other paper served or filed in a case." The Rule also provides, "[i]f a document is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the person whose signature is required." Fed.R.Bankr.P. 9011. Rule 9011 contains a narrow list of exceptions: "Excepted from the papers which an attorney for a debtor must sign are lists, schedules, statements of financial affairs, statements of executory contracts, Chapter 13 statements and amendments thereto." Fed.R.Bankr.P. 9011 advisory committee's note (1983). Modifications to a plan of reorganization are not designated within this group of exceptions and are, therefore, not exempted from the signature requirement. While the bankruptcy court's determination that the attorney for the debtor did not need to sign the first and second modifications to the Plan was error, it was harmless error. The remedy for the failure of an attorney to sign the modifications to a plan is to allow the attorney the opportunity to sign the modifications promptly. If the attorney does not sign them, the modifications must be stricken. It is reasonable to assume that if the bankruptcy court had correctly informed the debtor's attorney that she must sign the modifications to the Plan, she would have signed them. The Court finds that this error did not prejudice Beal, and that it is harmless error that does not require reversal.

## V. Classification of the Unsecured Claims

### A. Class 8

Beal alleges that the debtor improperly classified the unsecured creditors in three separate classes, Classes 6, 7 and 8.[2] First,

Beal contends that it should not have been placed in a class by itself. It alleges that the debtor designated a class solely for Beal in an attempt to gerrymander the votes of the unsecured creditors to effectuate a § 1129 cram down of the Plan over Beal's objections.

 Eleven U.S.C. § 1122(a) governs the classification of creditors. It states, in pertinent part, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a) The Fifth Circuit has held that as a general rule a party may not classify similar claims separately in order to gain an affirmative vote on a reorganization plan to facilitate a cram down. *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1279 (5th Cir.) *cert. denied*, 506 U.S. 821, 113 S.Ct. 72, 121 L.Ed.2d 37 *and cert. denied*, 506 U.S. 822, 113 S.Ct. 72, 121 L.Ed.2d 37 (1991). One exception to this rule is that a party may separate similar claims when there is a "good business reason" for doing so. *In re Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1167 (5th Cir.1993). Whether such "good business reasons" exist is a question of fact which is subject to the clearly erroneous standard of review. *Greystone*, 995 F.2d at 1281 n. 7. The Fifth Circuit has recognized that possession by a creditor of a "different stake in the future viability of the reorganized company" is a good business reason for separate classification. *Briscoe*, 994 F.2d at 1167 (quoting *In re U.S. Truck*, 800 F.2d 581, 587 (6th Cir. 1986)).

██ The *Briscoe* court found that the unsecured creditors could be classified separately because there was a good business reason for doing so. The facts in *Briscoe* are similar to the facts in the instant case. In *Briscoe*, the City of Fort Worth was a creditor and was classified in its own class under a Chapter 11 plan. *Briscoe*, 994 F.2d at 1167. The Fifth Circuit upheld the debtor's separate classification of the City because the

---

**2.** Class 6 is comprised of unsecured trade creditors who hold allowed claims of less than $1,000.00. Class 7 consists of unsecured credi-

tors whose allowed claims exceed $1,000.00. Class 8 is comprised of Beal's allowed unsecured claim in the amount of $1,474,595.43.

City had a different interest which distinguished it from other unsecured creditors. *Id.* Specifically, it had non-creditor interests relating to its urban housing program. *Id.* Analogously, HUD stated at the pre-trial hearing that it had non-creditor interests in the property, specifically public interests under the National Housing Act. (Tr. I at 113.) The Court finds that the debtor's separate classification of HUD is valid under the good business reason exception to the general rule against separating unsecured creditors into different classes.

### B. Classes 6 and 7

■ Beal next asserts that the debtor improperly classified the unsecured creditors with small claims into a separate class, Class 6. Eleven U.S.C. § 1122(b) provides that a debtor may separate unsecured claims into different classes when it is "reasonable and necessary for administrative convenience."[3] Whether a classification is reasonable and necessary is a question of fact, therefore, the bankruptcy court's finding is reviewed for clear error.

The debtor in the present case created Class 6 out of thirty-four unsecured trade creditors holding liens of less than $1,000.00 each. Beal contends that Class 6 does not meet the requirements of the administrative convenience exception articulated in 11 U.S.C. § 1122(b) because it was not reasonable and necessary to classify the Class 6 creditors separately.

■ In order to show that a classification is reasonable, the debtor must show that the administrative benefits the debtor will derive from the classification at issue outweigh the adverse effects that the classifica-

tion may render upon other entities and the Bankruptcy Code policies.[4] *In re S & W Enter.,* 37 B.R. 153, 159 (Bankr.N.D.Ill.1984). " 'It has always been assumed that the purpose of § 1122(b) was to allow special treatment for small claims, so that they could be eliminated early and reduce the number of claims that would have to be paid over time.' " *In re Leser,* 939 F.2d 669, 671 n. 4 (8th Cir.1991) (*quoting In re Storberg,* 94 B.R. 144, 146 n. 2 (Bankr.D.Minn.1988)). By placing the small trade creditors in a separate class, the debtor has fulfilled the purpose of § 1122(b). The plan provides that the Class 6 claims will be paid in one year rather than seven years. This treatment decreases the number of claims paid out over a long period of time and conforms with the purpose of § 1122(b). *See In re Leser,* 939 F.2d at 671 n. 4. The debtor's payment of the Class 6 claims in one year instead of seven also insures that the small trade creditors will continue to render the services necessary to the debtor's continued operations. Additionally, the evidence in the record supports the conclusion that the classification does not adversely affect other unsecured creditors. Class 8 receives more favorable treatment under the Plan than Classes 6 and 7, the classes that voted to accept the Plan.[5] Also, there is no detrimental effect on Code policies because there is no evidence that the debtor formed Class 6 for the purpose of gerrymandering the class votes, which is the main concern of the courts when determining the validity of classifications. Class 6 and Class 7 accepted the Plan, and even if those two classes had not been separately classified, the Plan still could have been crammed down over HUD's objection, since the votes of the combined class would have resulted in acceptance of the Plan.[6]

---

**3.** The pertinent language is as follows, "A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." 11 U.S.C. § 1122(b).

**4.** "Code policies" refers to the concerns of fairness and equity that debtors must meet when creating a plan that will be fair and equitable to all creditors. 11 U.S.C. § 1129(b).

**5.** Class 8 receives 25% of the value of its unsecured claim while Class 6 only receives 20% of

its unsecured claim. Although, Class 7 receives 20% of its claim (the same percentage as Class 6), it approved the Plan with the knowledge that the Class 6 claims would be paid in one year while the Class 7 claims would be paid over seven years.

**6.** According to 11 U.S.C. § 1126(c), a class of creditors accepts a Plan if 2/3 in amount and 1/2 in number of the claimants who cast votes vote to accept the Plan. Only two trade creditors in Class 6 voted and both voted to accept the Plan. Out of the five creditors in Class 7 who cast ballots four accepted the Plan and one rejected

The debtor must also demonstrate that the administrative convenience class is necessary. "Necessary" has been interpreted to mean "something more than just tending to ease the administrative burden." *In re S & W Enterprise,* 37 B.R. at 159. In the present case, the evidence demonstrates that it is necessary to swiftly pay the small trade creditors that comprise Class 6. (Transcript of Confirmation Hearing, March 22–24, 1993 pp. 380–84 [hereinafter Tr. II].) Unless the debtor pays a portion of their claims quickly, the small trade creditors likely will cease to provide services to the debtor that are necessary to maintain and run the Property, the primary asset of the debtor. This would place a burden on the debtor because it would be unable to obtain services of other trade creditors without paying higher prices for their services. (Tr. II at 380–82.) This increased burden would be detrimental to the debtor's ability to make payments under the Plan and would harm all of the creditors, including Beal.

The Court finds that the bankruptcy court's finding that the creation of Class 6 was both reasonable and necessary for purposes of administrative convenience was not clear error. The placement of the unsecured trade creditors holding claims of less than $1000.00 in a class of their own is valid for purposes of administrative convenience under 11 U.S.C. § 1122(b), therefore, the bankruptcy court's separate classification of Class 6 was not clear error.

### C. The Network Claim

Network Multi–Family Security Corporation ("Network") filed an allowed claim in the amount of $123,274.92. The debtor placed Network's claim in Class 7 with other unsecured creditors possessing claims in excess of $1,000.00. Beal alleges that the Debtor should not have included Network's claim in Class 7 because Net-

work's claim is not substantially similar to the claims of the other creditors included in Class 7. Beal argues that Network's claim is to be paid in full while the other members of Class 7 will only be paid 20% of their claims. Also, Beal alleges that Network's claim is not impaired because Network's contract was assumed, the default was cured, and Network was paid more than the amount of its allowed claim. However, HUD failed to specifically object at the confirmation hearing to the debtor's inclusion of Network's claim in Class 7 and, therefore, has waived its right to raise this issue on appeal. Furthermore, HUD stipulated in the joint pre-trial order to the inclusion of the Network claim in Class 7, and failed to include this issue in its designation of the issues on appeal. The Fifth Circuit has stated that, "[i]n the absence of a contemporaneous objection, the appeal of an alleged error is waived." *Chrysler Credit Corp. v. Whitney Nat. Bank,* 51 F.3d 553 (5th Cir.1995). The Court holds that Beal has waived the right to appeal any alleged error related to the classification of Network's claim in Class 7. The Court further holds that even if Beal did not waive its right to appeal any alleged error in the classification of Network's claim, it was not clear error for Network's claim to be classified in Class 7.

### D. Class 9

Additionally, Beal claims that the junior lienholders, who become equity interest holders under the Plan, were incorrectly classified with the general and limited partners in Class 9.[7] Eleven U.S.C. § 1122 requires that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122. The Court finds that the claims of the junior lienholders and the general and limited partners are substantially

7. The junior lienholders held liens on the Property amounting to approximately $900,000.00. These liens were junior to Beal's, and since the

it. Class 7 also met the 2/3rds-in-amount requirement because the four claimants who voted in favor of the Plan held claims amounting to $128,521.25 and the one rejecting claimant held a claim of $3,024.25.

value of the Property was less than the entire amount of Beal's original secured claim, these claims were, in effect, unsecured. They are treated as equity interest holders under the Plan because they have taken equity positions as a result of their post petition capital contributions to the debtor. (Tr. II at 519).

similar. Both the equity interest holders and the general and limited partners are required to make post-petition capital contributions. In return for these contributions they receive post-petition equity in the property. Accordingly, both the junior lienholders and the general and limited partners become equity interest holders under the Plan by virtue of their post-petition capital contributions and not because of their prepetition claims.[8] Since the interests of the junior lienholders and the general and limited partners become substantially similar under the Plan itself, the bankruptcy court did not err in classifying them together.

## VI. Feasibility of the Plan

■ The bankruptcy court used the "preponderance of the evidence" standard of proof to determine whether the Plan was feasible pursuant to § 1129. Beal contends that the court should have used the more stringent "clear and convincing" standard of proof. However, the appropriate evidentiary standard to use in determining plan feasibility is the "preponderance of the evidence" standard. *In re Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1164 (5th Cir.1993).

■ Beal attacks the feasibility of the Plan because it believes that the Plan does not present a "clear and accurate projection of repayment under the Plan." (Appellant's Br. at 28.) Beal bases this allegation on the fact that testimony concerning the time frames for payment under the Plan and the time frames detailed in the Plan itself were inconsistent. In determining the feasibility of a Plan, "[t]he court need not require a guarantee of success." *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 507 (Bankr.S.D.Tex. 1989). The bankruptcy court need only require a "reasonable assurance of commercial viability." *Id.* "Where the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive, the court may find the plan feasible." *Id.* at 508 n. 20.

■ While the testimony at the hearing regarding the feasibility of the Plan was somewhat contradictory, the Plan on its face and the modifications to the Plan are clear and unambiguous. The Plan has a nine year term. The unsecured creditors will receive payments over seven years, and Beal's secured claim will be satisfied over nine years. When the debtor changed the unsecured creditors' terms of payment from two years to seven years it included new projections for the payout of these claims; however, these new projections modify only the treatment of the Class 7 and Class 8 creditors' claims, not the projections for the other classes.[9] The Court finds that the Plan, as modified, provides substantial evidence to support a finding that the Plan is feasible despite any contradictory testimony at the confirmation hearing. The bankruptcy court's determination that the Plan as modified was feasible was not against the great weight of the evidence and, therefore, it was not clear error for the court to determine that the Plan was feasible.

■ Beal also alleges that the $900,000.00 in claims owed to the junior lienholders[10] was not discharged under the Plan, and that, therefore, the Plan is not feasible. Eleven U.S.C. §§ 1141(c) and (d) address the effect of the confirmation of a Chapter 11 Plan on the discharge of claims. Specifically, § 1141(c) states in pertinent part, "after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor." Additionally §§ 1141(d)(1)(A)(ii) and (B) state:

> Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—discharges the debtor from any debt that arose before the date of confirmation, ..., whether or not—such claim is allowed under § 502 of this title; ..., and termi-

---

8. It is the prepetition claims of the junior lienholders and the general and limited partners that Beal asserts are not substantially similar.

9. The debtor changed the terms of the payments on the Class 7 and Class 8 claims from two to seven years in the debtor's First Modification of the Plan.

10. See supra note 7.

nates all rights and interests of equity security holders and general partners provided for by the plan.

11 U.S.C. §§ 1141(d)(1)(A)(ii) and (B). The junior lienholders were party to the confirmation of the Plan and accepted the Plan. Furthermore, the Plan specifically deals with its effect on prepetition claims. The Plan provides, "[t]he treatment of and consideration to be received by holders of Allowed Claims or Interests pursuant to this Article V of this Plan shall be in full settlement, release and discharge of their respective claims and interests." (Debtor's Plan of Reorganization at 7.) A description of all the treatments of the classes, including the treatment to be received by the junior lienholders, follows. Accordingly, since no exception to discharge applies to the claims of the junior lienholders, their prepetition claims are extinguished by the confirmation of the Plan, and cannot, therefore, affect the operation or feasibility of the Plan.

The bankruptcy court's determination that the Plan was feasible was not in error. First, the bankruptcy court used the correct standard of proof, "preponderance of the evidence," to determine the feasibility of the Plan. Second, the Plan and the modifications thereto clearly indicate over what length of time the various claims will be paid. Third, the $900,000.00 in claims previously held by the junior lienholders have been discharged by the confirmation of the Plan, therefore, those claims do not affect the operation or feasibility of the Plan.

## VII. Fair and Equitable

■ Beal alleges that the bankruptcy court erred in its determination that 7.5% is the appropriate interest rate for the payments on its secured claim under the Plan. (Findings of Fact ¶ 51.) Beal contends that an interest rate of 7.5% does not allow it to recover the present value of its allowed secured claim, in violation of 11 U.S.C. § 1129. The court's determination of the correct interest rate is reviewed for clear error. *In re*

*Briscoe Enters., Ltd., II,* 994 F.2d 1160, 1169 (5th Cir.1993).

■ Eleven U.S.C. § 1129(b)(2)(A)(iii) provides that holders of secured claims must receive the "indubitable equivalent" of their claims under a plan. Legislative history suggests that Congress intended the phrase "indubitable equivalent" to mean that the secured creditor must be "compensate[d] for present value." *In re Monnier Bros.,* 755 F.2d 1336, 1339 (8th Cir.1985). *See also In re Lakeside Global II, Ltd.,* 116 B.R. 499, 512 (Bankr.S.D.Tex.1989). In order for the creditor to receive the present value of its secured claim, the court must calculate the appropriate interest rate.

■ The Fifth Circuit has found that both the original contract rate of interest and the treasury bill rate are appropriate benchmarks for calculating the correct interest rate under a plan. *Briscoe,* 994 F.2d at 1169. In the present case, HUD and the debtor agreed in their original contract to an interest rate of 7%. Additionally, there was testimony that 7.5% was slightly above the nine year treasury bill rate. (Tr. II at 43.) [11] Another factor courts consider is the average interest rate on property similar to the property under the Plan. The court heard testimony that 6 1/2–8% was the typical interest rate for a property similar to the apartment complex in the present case. (Tr. II at 44.) The Court also heard evidence that the prime rate at the time of the hearing was 6%. (Tr. II at 44.) [12] The District Court for the Eastern District of Texas recently found that 7.5% was an appropriate interest rate on HUD's secured interest in a property, similar to the Property in this case. *Dept. of Housing and Urban Dev. v. Westwood Plaza Apartments, Ltd. (In re Westwood Plaza Apartments, Ltd.),* 192 B.R. 693, 697 n. 3 (Bankr.E.D.Tex.1996). The *Westwood* court arrived at this conclusion by adding 1% to the then prime rate of 6.5%, using certain risk factors which took into account the risks associated with repayment to the creditor under the Plan. *Id.* Typically, courts use

---

11. Beal is to be paid over nine years under the Plan.

12. The prime rate may also be used as the benchmark for determining the appropriate rate of interest. *In re Westwood Plaza Apts.,* 147 B.R. 692, 701 (Bankr.E.D.Tex.1992).

these risk factors to determine the extra percentages of interest that should be added on to a base rate such as the prime rate or the treasury bill rate. *In re Westwood Plaza Apts.*, 147 B.R. 692, 701 (Bankr.E.D.Tex. 1992). The risk factors include the length of the payout, the quality of the security, and the risk of default. *Id.* In the present case, there was uncontroverted testimony that there was a minimal risk to HUD under the Plan because it was projected that the market conditions would not worsen and, therefore, the debtor would not be impeded from making the payments required under the Plan. The evidence taken as a whole shows that the bankruptcy court did not commit clear error in determining that the appropriate interest rate under the Plan should be 7.5%.

## VIII. The Absolute Priority Rule

 Beal alleges that the Plan violates the "absolute priority rule" codified at 11 U.S.C. § 1129(b)(2)(B)(ii) which provides in pertinent part: "[w]ith respect to a class of unsecured claims—the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." Beal contends that the debtor violated this code provision by allowing the general and limited partners and the junior lienholders in Class 9 to contribute $150,000.00 in post-petition value to the debtor in return for an equity interest under the Plan. The Court finds that allowing the general and limited partners and the junior lienholders to invest new capital in exchange for equity in the property does not violate the absolute priority rule because the Court holds that the post-petition contribution is allowed under the new value exception to the

absolute priority rule. *See In re Batten*, 141 B.R. 899, 907–08 (Bankr.W.D.La.1992).

 The courts have struggled with the question of whether the new value exception survived the codification of the absolute priority rule in § 1129 of the Bankruptcy Code and the Supreme Court's decision in *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). *See In re Mortgage Inv. Co. of El Paso, Texas*, 111 B.R. 604, 617–19 (Bankr.W.D.Tex.1990) (citing *Ahlers*, 485 U.S. at 203–04 n. 3, 108 S.Ct. at 967 n. 3). In *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 948 F.2d 134 (5th Cir.1991), the Fifth Circuit considered the existence *vel non* of the new value exception. The Fifth Circuit reversed the district court's holding that the new value exception does exist under the Code and held that there is no "new value exception" to the absolute priority rule codified at 11 U.S.C. § 1129(b)(2)(B). *Id.* However, on February 27, 1992, the Fifth Circuit, on petition for rehearing and suggestion for rehearing en banc, withdrew and deleted the portion of its earlier opinion that dealt with the new value exception. The court specifically stated, "the bankruptcy court's opinion on the 'new value exception' to the absolute priority rule has been vacated and we express no view whatever on that part of the bankruptcy court's decision." *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1284 (5th Cir.), *cert. denied*, 506 U.S. 821, 113 S.Ct. 72, 121 L.Ed.2d 37 *and cert. denied*, 506 U.S. 822, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992). Therefore, at this time, the Fifth Circuit has neither accepted nor rejected the new value exception. This Court hereby holds that the "new value exception" did survive codification in the Bankruptcy Code of the absolute priority rule.[13]

---

**13.** Some courts have held that the "new value exception" is not an exception at all but rather a corollary to the absolute priority rule. *See, e.g., In re Woodbrook Assoc.*, 19 F.3d 312, 320 (7th Cir.1994); *In re Bonner Mall Partnership*, 2 F.3d 899, 906 (9th Cir.1993), *cert. granted*, 510 U.S. 1039, 114 S.Ct. 681, 126 L.Ed.2d 648 (1994), *and appeal dismissed*, 115 S.Ct. 386 (1994); *In re Montgomery Court Apts.*, 141 B.R. 324, 343 (Bankr.S.D.Ohio). The courts that have reached this conclusion have done so because of the

phrase "on account of" in § 1129. Section 1129 prohibits old investors from receiving an interest in the property of the bankruptcy estate "on account of" their prior equitable ownership. *In re Snyder*, 967 F.2d 1126, 1130 (7th Cir.1992). Therefore, when investors receive new equity in the property "on account of" their infusion of *new value*, their contribution and subsequent interest in the property would not violate the absolute priority rule. Furthermore, new value, contributed post-petition is not property of the estate

 The new value exception allows investors or other junior claimants to retain an interest in the debtor in return for post-petition capital contributions so long as the contributions are fair and equitable. *In re Dowden*, 143 B.R. 388, 392 (Bankr.W.D.La. 1989). There are four requirements for the new value exception to apply. The post-petition contribution must be: (1) new; (2) reasonably equivalent to the value received in return; (3) necessary to an effective reorganization; and (4) in the form of money or money's worth. *In re Montgomery Court Apts.*, 141 B.R. 324, 344 (Bankr.S.D.Ohio 1992). *See also In re Batten*, 141 B.R. 899, 908 (Bankr.W.D.La.1992).

 In the present case, the requirements of the new value exception are met. First, the general and limited partners contributed new value in the amount of $150,-000.00 after the Chapter 11 petition was filed. Second, the $150,000.00 was in cash. Third, the bankruptcy court found that the contribution was reasonably equivalent to the value received because although the investors may receive a high rate of return nine years in the future they are placing their money in a high risk investment and it is possible that they will receive no return on their capital contribution. (Tr. II at 51, 437–47.) The evidence in the record as a whole supports the conclusion that the $150,000.00 in new value is reasonably equivalent to the potential return on the investment. Lastly, in order to be necessary to an effective reorganization, the new capital must be essential for the success of the Plan. *See Batten*, 141 B.R. at 908. The debtor presented evidence supporting the conclusion that the capital contribution was necessary for the property to continue operating, in order to make the

initial payments to creditors under the Plan, and to perform maintenance on the apartment complex. (Tr. II at 51.) The bankruptcy court's finding that the post-petition capital infusion was necessary to an effective reorganization, (Findings of Fact ¶ 55), was not clear error.

 The Court reviews de novo the bankruptcy court's holding that the Plan does not violate the absolute priority rule codified at 11 U.S.C. § 1129(b)(2)(B)(ii). (Conclusions of Law ¶ 26.) Based on a review of the record as a whole, the Court holds that the general and limited partners and junior lienholders did not retain an interest in the Property under the Plan *on account of* their old claims or interests, and, therefore, pursuant to the new value exception, the Plan does not violate the absolute priority rule.

## IX. Assignment of Rents

Beal alleges that the bankruptcy court incorrectly calculated the amount of Beal's secured claim. Beal contends that the court erred by not treating Beal's "perfected security interest and assignment of rents and profits of the Property" as additional collateral, when determining the amount of Beal's secured claim. (Findings of Fact ¶¶ 8, 63.) The bankruptcy court found that Beal's secured claim totaled $2,150,000.00 and determined that amount should be reduced by post-petition payments made by the debtor to HUD. (Findings of Fact ¶ 63.) The post-petition rents projected to be earned on the Property and paid to Beal by the debtor are included in that category of post-petition payments. If those projected rents were included in the valuation of Beal's secured

under 11 U.S.C. § 541, and, therefore, extraction of this new value by an equity interest holder in the form of new equity would not constitute a distribution of property of the estate and could not violate the absolute priority rule. *See The Penn Mut. Life Ins. Co. v. Woodscape Ltd. Partnership (In re Woodscape Ltd. Partnership)*, 134 B.R. 165, 173 (Bankr.D.Md.1991) ("The infusion of new value in money or money's worth from sources which are not property of the estate, even if from an equity holder, is an independent act which is not per se a violation of the absolute priority rule. Such an infusion of new value

does not constitute a distribution of property values of the estate to unsecured creditors before equity interest holders.") Whether the "new value exception" is an exception to or a corollary of the absolute priority rule is largely a distinction without a difference and courts that determine it to be a corollary may continue to refer to it as an exception in the interest of uniformity. *In re Bjolmes Realty Trust*, 134 B.R. 1000, 1004 n. 4 (Bankr.D.Mass.1991). This Court, in the interest of clarity, and regardless of whether the "new value exception" is truly an exception or instead, as is more plausible, a corollary, will refer to it as the "new value exception."

claim, then the bankruptcy court correctly determined that the total amount of Beal's secured claim should be reduced as those rents are paid to Beal.

 While the court did not specifically find that the rental income was utilized in arriving at the $2,150,000.00 value for the property, the evidence in the record shows that rental income was taken into account by the appraisers when determining the overall value of the property and setting the amount of Beal's secured claim.[14] The bankruptcy court did not commit clear error by allowing Beal's secured claim to be reduced by rental income because the evidence in the record supports the bankruptcy court's implicit finding that the future rental income was taken into account in the valuation of the property and thereby used in determining the amount of the secured claim.

## X. The Right to Credit Bid Under § 1111

 Beal alleges that the Plan should not have been confirmed because it does not provide Beal with the right to notice or the right to credit bid.[15] Beal contends that the failure of the Plan to provide to it these rights violates the guarantee of fairness and equity codified at § 1129 of the Bankruptcy Code.

 First, the bankruptcy court found that Beal has the right to approve any future sale consistent with the rights it held under HUD's original loan agreement with the Debtor.[16] Since Beal, pursuant to the original contract, has the right to approve any future sale of the property, it clearly has the right to notice of any future sale. Second, the failure of the Plan to give Beal the right to credit bid does not violate the code policies of fairness and equity. Eleven U.S.C. § 1111(b)(1)(A)(ii) provides in pertinent part:

[a] claim secured by a lien on property of the estate shall be allowed or disallowed under § 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless such holder does not have such recourse and such property is sold under § 363 of this title or is sold under the plan.

The "unless" clause stated above is commonly referred to as the "sale exception." The "sale exception" provides that a nonrecourse creditor may not receive recourse status if the property is sold pursuant to § 363 or under the Plan. The sale exception is only invoked if the nonrecourse creditor has the opportunity to credit bid the full amount of its claim at the sale of the collateral. *T–H New Orleans Ltd. Partnership v. Financial Sec. Assurance, Inc. (In re T–H New Orleans Ltd. Partnership)*, 10 F.3d 1099, 1102 (5th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1833, 128 L.Ed.2d 461 (1994). It was "the clear intent of the draftsmen of the Code to protect the non-recourse secured creditor by permitting such creditor to have recourse against the debtor, if the creditor is not permitted to bid in the amount of such creditor's debt in connection with a sale of the creditor's collateral." *In re Waterways Barge Partnership*, 104 B.R. 776, 781 (Bankr. N.D.Miss.1989). Therefore, when a lienholder is not allowed to credit bid at a sale the "sale exception" does not apply and the lienholder retains the recourse status it gained by virtue of § 1111(b)(1)(A). *Id.*

Consequently, as long as Beal retains its recourse status under the Plan, the Code does not require that it have the right to credit bid. Because Beal's claim is treated as having recourse status under the Plan, Beal does not have to be afforded the right to

---

**14.** One appraiser testified to the fact that in estimating the value of land he considered the "rent comparables of similar properties to deduce the gross income for the property" and in turn calculate the value of the property. (Tr. II at 163.) Later in his testimony, the appraiser also stated that he considered "rents in the marketplace that were being obtained by similar properties." (Tr. II at 169.)

**15.** The right to credit bid is the right of the secured creditor to "bid" the amount of its claim at a subsequent sale of the property.

**16.** HUD's Regulatory Agreement with the debtor specifically states, "Owners shall not without prior approval of the Secretary: Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer or encumbrance of such property." (Ex. C at 2).

credit bid, therefore, the bankruptcy court did not err when it did not provide Beal with the right to credit bid under the Plan.

## XI. Conclusion

For the above-stated reasons, it is hereby ORDERED that the bankruptcy court's confirmation of the debtor's Chapter 11 Plan of Reorganization is AFFIRMED.

SO ORDERED.